**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**FMC CORPORATION, Defendant-**
**Appellant.**

**No. 408, Docket 77–1372.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 30, 1977.
Decided Feb. 23, 1978.

See also, 428 F.Supp. 615.

Kenneth A. Cohen, Asst. U. S. Atty. for the Western District of New York, Buffalo, N. Y. (Richard J. Arcara, U. S. Atty. for the Western District of New York, Buffalo, N. Y., of counsel), for plaintiff-appellee.

Paul B. Zuydhoek, Buffalo, N. Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., of counsel), for defendant-appellant.

Before MOORE and GURFEIN, Circuit Judges, BONSAL,* District Judge.

MOORE, Circuit Judge:

This is an appeal from a judgment of conviction entered after a jury trial against FMC Corporation ("FMC"), for violation of the Migratory Bird Treaty Act, by killing 92 migratory birds in violation of 16 U.S.C. § 703. The jury convicted defendant FMC of 18 counts of the 36 counts in the indictment.

The indictment charged that FMC between April 23, 1975 and June 25, 1975 (exact dates unknown) "did unlawfully by means of toxic and noxious waters kill migratory birds included in the terms of the conventions between [specifically naming treaties between the United States of America and Great Britain (1916), the United Mexican States (1936), and the Government of Japan (1972)], all in violation of Title 16, United States Code, section 703".

Each count of the indictment specifies the date of discovery of the alleged killing, the number of birds killed, ranging from 1 bird in each of 24 counts to 2 to 26 birds in the remaining 12 counts. The varieties of birds were described in the indictment by their ornithological and more common titles and included the Eremophila alpestris (Horned Lark), the Butorides virescens (Green Heron) and Brata canadensis (Canada Goose). They will be referred to herein as "birds".

Defendant was fined $100 on each of the 18 counts, but the fine was remitted on all but 5 counts.

The 18 counts selected by the jury for conviction covering alleged killings between April 25, 1975 and June 9, 1975 and the 18 counts for acquittal between April 23, 1975 and June 25, 1975, present no clue useful on appellate review unless there were jurors disposed favorably to the Ringbilled Gull and Shortbilled Dowicher (Counts 10 and 13) and less favorably to the Least Sandpiper and the Migratory Fringillid (Counts 8 and 36). Equally baffling is the trial court's remission of the fines except for 5 birds found dead between April 25 and May 7 (Counts 3, 4, 5, 7 and 9), because fines were imposed on 18 counts between April 25 and May 29.

So far as pertinent, the Migratory Bird Treaty Act ("MBTA") provides:

". . . it shall be unlawful at any time, by any means or in any manner, to . . . kill . . . any migratory bird . . . included in the terms of the conventions between the United States and Great Britain . . . [Mexico] . . . [and Japan]. . . ." 16 U.S.C. § 703.[1]

---

* Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

1. The statute declares as unlawful "to pursue, hunt, capture, kill, attempt to take, capture or kill . . . ." Query, whether the word "kill" must be read in connection with the surrounding words and whether it is only mentioned as the usual result of pursuing, hunting or capturing.

A separate section provides for the penalties under the MBTA:

"(a) . . . any person . . . or corporation who shall violate . . . section 703 . . . shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $500 or be imprisoned not more than six months, or both." 16 U.S.C. § 707.

The issue before us, as it was before the trial court and as charged to the jury, is clearly framed: does the statute require that the violation be intentional or in other words, where a crime is involved and a criminal penalty imposed for the violation thereof, must the violator have a *mens rea*.

## I. THE CHARGE OF THE COURT

With the undisputed fact that the birds died as a result of the noxious waters in the pond, the Court's charge was virtually a directed verdict. The Court charged:

"Such legislation [the statute here in issue] dispenses with the conventional requirement for criminal conduct; namely, awareness of wrongdoing and the specific intent to violate the law.

\*　　\*　　\*　　\*　　\*　　\*

In order to protect this public interest has lead [sic] to the creation of this particular statute which prohibits the killing of birds regardless of the means or manner. Therefore, under the law good will and good intention and measures taken to prevent the killing of the birds are not a defense. Therefore, if you find that the birds were killed by the products emitted from the FMC plant then you must return a verdict of guilty. . . ." (358a, 359–60a).

To make doubly sure that intent was not a factor to be considered, the charge continued:

"The Government in this case does not have to prove that the defendant intended to kill the birds. You may convict the corporation even if you find that the killing of the birds was accidental or unintentional provided that you find that the FMC Corporation did kill the birds as charged in the indictment. . . ." (360a–61a).

Lack of necessity for establishing intent is further emphasized by the court's feeling of an obligation to tell the jury that the remedial steps taken by FMC to avoid the casualties are "under the Law . . . not a defense". (344a).

The Government argues that the statute makes it "unlawful at any time, by any means or in any manner, to . . . kill, [or] attempt to . . . kill . . . any migratory bird . . ." and that there is no requirement of intent. FMC on the other hand, claims that the very use of the word "kill" imports an intentional act and that this interpretation is buttressed by the word "attempt" which, of necessity, would require an affirmative voluntary act.[2]

## II. FACTS

FMC operates a plant in Middleport, New York which manufactures various pesticides including carbofuran[3] and dithiocarbamates. Production of the dithio carbamates requires large amounts of wastewater. This wastewater was stored in a ten acre pond which held approximately 12 million gallons of water. This pond also held small amounts of wash water from the production of carbofuran. Before any wash water from the carbofuran operation went into the pond, it was chemically treated in a sump to breakdown the carbofuran into environmentally safe constituents. Thus, carbofuran itself, as opposed to the dithiocarbamates, should not have been present in the pond.

---

**2.** Appellant claims support from the amendment of the Bald Eagle Protection Act, 16 U.S.C. § 688, which added to the previous statute [in form similar to § 703] the words "knowingly, or with wanton disregard for the consequences of his act" and increased the penalties drastically, namely, fines from up to $500 to up to $5000 and imprisonment from not more than six months to not more than one year or both.

**3.** Carbofuran is primarily used on corn for the control of rootworms and various insects. (148a).

The size of the open water area attracted waterfowl during migration. In April of 1975, dead birds were discovered at the pond. Five dead birds were originally discovered on or about April 11, 1975. In the process of removing them on April 23, 1975 additional dead birds (26 Canadian Geese and 8 or 9 ducks) were discovered. On April 25 representatives of New York State Fish and Wildlife visited the site after hearing reports on dead birds. At that time the cause of the deaths was unknown, but a chemist from the Department of Environmental Conservation visited FMC on May 7 in an effort to determine the cause of death.

Dead birds continued to be found throughout April and May, and FMC attempted various measures to keep birds away from the pond. They tried using styrofoam floats to frighten the birds. There was some evidence that rather than frighten the birds, the floats acted like hunting decoys and attracted more birds. (237–38a). On May 16 a federal Fish and Wildlife Agent visited the FMC plant. He suggested various methods of repelling the birds, including zon guns (loud cannons), cracker shells (loud shotgun shells) and netting over the pond. FMC tried the zon guns, but they disturbed nearby citizens at night. On May 29 FMC was informed that carbofuran was the suspected cause of death. Analysis of the water in the pond indicated an extremely high concentration of carbofuran of approximately 75 parts per million which is roughly 200 times greater than the level which could cause a significant probability of death to birds. On June 13 FMC employed guards to keep the birds away, but the guards were derelict in their duties, sometimes sleeping on the job, and bird deaths continued. By the end of June, FMC had analyzed the sump used to breakdown the carbofuran and discovered it was ineffective and that carbofuran was being pumped directly into the pond.

On July 30 the indictment was handed down covering the period from April 11 to June 25, 1975. Measures taken after the time period covered by the indictment proved more effective in stopping the bird kills. During July the guard system became effective, avalarms were installed (loud pitched alarms which stimulate the distress cry of a bird), chemicals were added to the pond to break down the carbofuran, and nets were installed over the pond. By the time of trial the pond was completely graded over, having been replaced by a wastewater treatment facility.

## III.  DISCUSSION

Where there is no help to be had from legislative history or decisional authority, as in this specific situation, resort must be had to a rule of reason or even better, common sense. That the penalty is only a $500 fine or imprisonment for not more than six months, or both, does not affect the propriety of a criminal conviction. Were a corporate officer to have been added as a defendant he would not regard as *de minimis* a sentence of only six-months which, if consecutive on 36 counts, would be 18 years. Of course, this is a *reductio ad absurdum* argument but so is the Government's claim that the statute as to killing is "without limitation" (Appellee's Br. p. 13). Certainly construction that would bring every killing within the statute, such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense. As stated in one of the early decisions under the Act, "[a]n innocent technical violation on the part of any defendant can be taken care of by the imposition of a small or nominal fine." *United States v. Schultze*, 28 F.Supp. 234, 236 (W.D.Ky.1939). Such situations properly can be left to the sound discretion of prosecutors and the courts.

Although in search for analogies the hunting cases are not entirely apposite, they may be considered in attempting to balance public policy in support of the protection of migratory birds with a reluctance to charge anyone with a crime which he does not know he is committing.

These cases involving hunters have consistently held that ". . . it is not necessary that the government prove that a defendant violated its [Migratory Bird Treaty Act] provisions with guilty knowledge or specific intent to commit the violation". *Rogers v. United States*, 367 F.2d 998, 1001 (8th Cir. 1966), *cert. denied*, 386 U.S. 943, 87 S.Ct. 976, 17 L.Ed.2d 874 (1967). *See, e. g., United States v. Ireland*, 493 F.2d 1208 (4th Cir. 1973); *United States v. Wood*, 437 F.2d 91 (9th Cir. 1971); *United States v. Olson*, 41 F.Supp. 433 (W.D.Ky.1941); *United States v. Schultze*, 28 F.Supp. 234 (W.D.Ky. 1939). In *Shultze*, for example, defendants were convicted of violating the MBTA and regulations by taking morning doves lured to a field by the use of wheat "bait". The court rejected defendants' contention that they had not baited the field and had no knowledge that the field was baited. The court found each defendant guilty "even though there was no evidence of any guilty knowledge or intent upon his part at the time of the commission of the offense". *Id.* at 236.

FMC was manufacturing a powerful pesticide. For the protection of its employees it had to wash down the areas where carbofuran was manufactured. The washwater was pumped into a sump where it was to decompose into safe constituents before entering the pond. As a result of more frequent washdown procedures, instituted in the prior few months to protect workers, the carbofuran did not remain in the sump long enough to decompose. (373a). The washwater was pumped into the pond and in such quantities that migratory birds were killed. It can be assumed that FMC did not know for some weeks that carbofuran was the cause of the deaths; that it took remedial measures in an effort to keep the birds from the pond; that it conferred with State and Federal Conservation agencies and gave them full cooperation as to ways and means of avoiding the danger. Yet the fact remains that it was FMC's product which killed the birds.

■ FMC contends that even if "the killing of migratory birds need not be accompanied by knowledgeable violation of the law" (as in the hunter cases), there must be "an intent to harm birds culminating in their death for there to be a conviction" (Appellant's Br. at 11). FMC argues that it had no intention to kill birds, that it took no affirmative act to do so, possessed no *scienter*, and thus should not be held liable under the Act. It argues that, even in public welfare offenses, some "act" must be intended. In the hunter cases the act was pulling the trigger. In the case of *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (holding president of drug company liable for shipping misbranded drugs in interstate commerce), the act was the shipping of the drugs. However, the term "act" itself is ambiguous, and a person failing to act when he has a duty to do so may be held to be criminally liable just as one who has acted improperly. *See* G. Hughes, *Criminal Omissions*, 67 Yale L.J. 590 (1958). In the most recent Supreme Court case imposing criminal liability for violation of the Food, Drug and Cosmetic Act, the Supreme Court held that the president of a national retail food chain was criminally liable because food being held for sale in a warehouse was allowed to be exposed to contamination by rodents, notwithstanding his lack of knowledge of the situation. *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). The Court analyzed cases such as *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and determined:

"In the latter class of cases, the liability of managerial officers did not depend on their knowledge of, or personal participation in, the act made criminal by the statute. Rather, where the statute under which they were prosecuted dispensed with 'consciousness of wrongdoing,' an omission or failure to act was deemed a sufficient basis for a responsible corporate agent's liability." *Park, supra*, 421 U.S. at 670–71, 95 S.Ct. at 1911.

Thus, *Dotterweich, supra*, may be viewed not as an affirmative act of shipping misbranded drugs, but "as holding criminally accountable the persons whose failure to exercise the authority and supervisory re-

sponsibility reposed in them by the business organization resulted in the violation complained of . . . ." *Park, supra,* at 671, 95 S.Ct. at 1911. The criminal law may punish "neglect where the law requires care, or inaction where it imposes a duty". *Morissette, supra,* 342 U.S. at 255, 72 S.Ct. at 246. "The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumes his responsibilities." *Id.* at 256, 72 S.Ct. at 246.

■ Here FMC did perform an affirmative act—it engaged in the manufacture of a pesticide known to be highly toxic. Then it failed to act to prevent this dangerous chemical from reaching the pond where it was dangerous to birds and other living organisms that ingested, or came into close contact with, the chemical. Such a situation is analogous to the situations in the various tort notions of strict liability which have insinuated themselves into American law since the English case of *Rylands v. Fletcher,* 3 Hurl. & C. 774 (1865), L.R. 1 Ex. 265 (1866), L.R. 3 H.L. 330 (1868). In that case a reservoir was built on the site of an abandoned coal mine. When the reservoir was filled, water leaked through the unused shaft and into an adjoining mine. The plaintiff was granted damages for the injury to his mine caused by the flooding. In so finding, the Exchequer Chamber stated:

> "We think that the true rule of law is that the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it at his peril and if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape." L.R. 1 Ex. 265, 279 (1866).

Subsequently, strict liability has been deemed to apply in various *Rylands v. Fletcher* situations and also when a person engages in extrahazardous activities. It has been applied to such areas as filth in a cesspool (*Ball v. Nye,* 99 Mass. 582 (1868)), blasting (*Enos Coal Mining Co. v. Schuchart,* 243 Ind. 692, 188 N.E.2d 406 (1963)),

and crop dusting (*Young v. Darter,* 363 P.2d 829 (Okl.1961)). Strict liability has also been adopted by the Restatement (Second) of Torts, Tentative Draft No. 10 (April 24, 1964):

> "(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent such harm.
> (2) Such strict liability is limited to the kind of harm, the risk of which makes the activity abnormally dangerous." *Id.* § 519.

■ The principle here is the same as in the tort situation even though in this case the carbofuran remained on the property of FMC, and the birds found their way to the attracting FMC pond. When one enters into a business or activity for his own benefit, and that benefit results in harm to others, the party should bear the responsibility for that harm.

> " 'The principle of law behind all these cases is, it is submitted, if a man takes a risk, which he ought not to take without also taking upon his shoulders the consequence of that risk, he shall pay for any damage that ensues.' . . . It means that the enterprise, involving as it does unusual hazards, considering the time and the locality, must pay its way." (footnote omitted). Harper & James, *The Law of Torts 801* (1956).

Some 60 years ago a Congressman in proposing protective legislation said, in the rather florid language of the day:

> "Let the songbird live to herald to the world its happy and joyous anthem proclaiming the goodness of God to all its creatures . . .
> Civilization, ever advancing along the world's pathway, pleads for humanity, for the birds, so helpless and yet so useful." (Appellee's Br. p. 27).

As civilization advances so have other protections for individuals against convictions without *scienter* or even knowledge that a crime is being committed. But as

science, with its technological achievements, produces an ever widening array of poisonous pesticides for the destruction of food-and-grain destroying insects, so the manufacturers of such products will have to be ever on guard lest the waste created in the manufacturing process causes damage. The vast areas of our national industry, including pesticide manufacturing,[4] which have come under the scrutiny of the Environmental Protection Agency, attest to the difficulty of avoiding conflict between crop destruction by insects and the dangers to wildlife resulting from noxious pesticides, designed to avoid such destruction.

Although FMC was not aware of the lethal-to-birds quality of the water in its pond (and in fairness to FMC this may be assumed) nevertheless it was aware of the danger of carbofuran to humans—a fact which caused FMC to wash down the carbofuran areas more frequently, which activity in turn pumped contaminated water into the pond. Imposing strict liability on FMC in this case does not dictate that every death of a bird will result in imposing strict criminal liability on some party. However, here the statute does not include as an element of the offense "wilfully, knowingly, recklessly, or negligently"; implementation of the statute will involve only relatively minor fines; Congress recognized the important public policy behind protecting migratory birds; FMC engaged in an activity involving the manufacture of a highly toxic chemical; and FMC failed to prevent this chemical from escaping into the pond and killing birds. This is sufficient to impose strict liability on FMC.

Accordingly, we affirm.