182 N.J. Super. 210 (1981)
440 A.2d 455
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF-APPELLANT,
v.
VENTRON CORPORATION, A MASSACHUSETTS CORPORATION; WOOD RIDGE CHEMICAL CORPORATION, A NEVADA CORPORATION; ROBERT M. WOLF & RITA W. WOLF, HIS WIFE; UNITED STATES LIFE INSURANCE COMPANY, A NEW YORK CORPORATION, VELSICOL CHEMICAL CORPORATION AND F.W. BERK AND COMPANY, INC., DEFENDANTS-APPELLANTS, AND ROVIC CONSTRUCTION CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, BY ITS STATUTORY RECEIVER, JOSEPH KEANE, INTERVENOR-PLAINTIFF,
v.
VENTRON CORPORATION, A MASSACHUSETTS CORPORATION; WOOD RIDGE CHEMICAL CORPORATION, A NEVADA CORPORATION; VELSICOL CHEMICAL CORPORATION AND F.W. BERK & CO., INC., DEFENDANTS, AND MOBIL OIL CORPORATION, CHEVRON U.S.A., INC., TEXACO, INC., AND EXXON COMPANY U.S.A., FOREIGN CORPORATIONS AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, PLAINTIFFS-RESPONDENTS,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION AND STATE OF NEW JERSEY DEPARTMENT OF THE TREASURY, SPILL COMPENSATION FUND, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 10, 1981.
Decided December 9, 1981.
*215 Before Judges BOTTER, ANTELL and FURMAN.
Ronald P. Heksch, Deputy Attorney General, argued the cause for appellant State of New Jersey, Department of Environmental Protection (James R. Zazzali, Attorney General, attorney; John J. Degnan, former Attorney General; Erminie L. Conley, Assistant Attorney General, of counsel; Ronald P. Heksch and Mary C. Jacobson, Deputy Attorney General, on the brief).
Harry R. Hill, Jr. argued the cause for the appellants Ventron Corporation and Wood Ridge Chemical Corporation (Backes, Waldron & Hill, attorneys; Michael J. Nizolek on the brief).
*216 Adrian M. Foley, Jr. and John F. Neary, argued the cause for Velsicol Chemical Corporation (Connell, Foley & Geiser, attorneys; John E. Neary, on the brief).
Murry D. Brochin argued the cause for appellants Robert M. Wolf and Rita W. Wolf (Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, attorneys).
Barry H. Evenchick argued the cause for the New Jersey Spill Compensation Fund (Shanley & Fisher, attorneys; John J. Francis, Jr., and Richard A. Levao on the brief).
The opinion of the court was delivered by FURMAN, J.A.D.
Interlocutory appeals and cross-appeals were brought from judgments in an action by the Department of Environmental Protection (DEP) resolving statutory and common law liability for the cleanup and removal of mercury pollution in and adjoining tide-flowed Berry's Creek in Bergen County. After a 55-day trial without a jury the trial judge determined that F.W. Berk & Company (Berk) was jointly and severally liable; that Wood Ridge Chemical Corporation (Wood Ridge) was jointly and severally liable; that Velsicol Chemical Corporation (Velsicol) was severally liable for half the costs; that Ventron Corporation (Ventron) was severally liable for half the costs and that Robert and Rita Wolf (Wolfs) were not liable. In addition, the judge imposed liability against Velsicol for the surfacing of its 33-acre property adjoining Berry's Creek in order to prevent future run-off or drainage of mercury into Berry's Creek.
On their cross-claim the Wolfs were granted judgment against Ventron for fraudulent nondisclosure of mercury pollution in the sale and conveyance of a 7.1-acre property, inland from the Velsicol property and the site of a mercury processing plant from 1929 to 1974. The judgment below also set forth that the Spill Compensation Fund established under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., L. 1976, c. 141, "constitutes a source of money which is available ... to abate *217 problems such as the one before the Court." Both of these provisions of the judgment are also appealed.
The substantially undisputed facts are as follows. Berk owned and operated the mercury processing plant from 1929 to 1960 on a 40-acre tract west of Berry's Creek. In this litigation Berk is in default. The adjudication of its joint and several liability is not challenged on appeal.
Velsicol formed and capitalized Wood Ridge as its wholly-owned subsidiary in 1960. Wood Ridge then purchased Berk's assets, including the 40-acre tract. From 1960 to 1974 Wood Ridge operated the mercury processing plant. In 1967 Wood Ridge declared a land dividend of 33 acres, subdivided from the 40-acre tract, to its parent corporation Velsicol. Velsicol has remained the owner of the 33-acre tract. It sold all the capital stock of Wood Ridge to Ventron in 1968.
The adjoining 7.1-acre tract, on which the mercury processing plant was located, was owned by Wood Ridge until its merger into Ventron in 1974. The plant was shut down, machinery and equipment were sold by Ventron to Troy Chemical Company and removed from the site, and the 7.1-acre tract was conveyed by Ventron to the Wolfs.
During the operation of the mercury processing plant by Berk and Wood Ridge, mercury flowed and drained into Berry's Creek from the industrial site via waste effluents, groundwater leaching and surface run-off. Mercury content in the waste effluents piped to the creek was as much as two to four pounds a day. Mercury-contaminated waste was dumped on both the 7.1-acre tract and the 33-acre tract. The trial judge reached a finding, which was supported by credible evidence, that Velsicol accepted dumping of mercury-contaminated waste on its property until the shutdown of Wood Ridge's operations in 1974.
The trial judge concluded that Berry's Creek adjoining the Velsicol property is heavily polluted and a public nuisance through the "vast cumulative effect" of mercury pollution. The concentration of mercury in the sediments of Berry's Creek for a *218 stretch of several thousand feet is the highest reported in freshwater sediments anywhere in the world, far exceeding acceptable standards. The toxic compound methyl mercury has been and is being formed through chemical processes. Mercury in the water of Berry's Creek is at dangerously high concentrations, particularly so during storms.
Because of the diminished oxygen in Berry's Creek, fish are only present when swept in by the tide. As the result of feeding by fish off microorganisms in the sediments, there is a threat of mercury poisoning to humans who, in turn, eat the fish.
A reliable expert witness estimated the weight of mercury in the subsoil and groundwater under the 33-acre tract owned by Velsicol and the 7.1-acre tract owned by the Wolfs at 268 tons. The trial judge found that mercury is still carried to Berry's Creek via surface water run-off from the Velsicol property but that DEP failed to prove present groundwater leaching of mercury into the creek.
The highest surface and subsurface concentration of mercury is on the Wolf property, formerly the site of the mercury processing plant. After acquiring title in 1974 the Wolfs demolished the five industrial buildings and built warehouses. With the approval of DEP and the Federal Environmental Protection Agency the Wolfs excavated the upper layer of mercury-contaminated soil from the easterly portion of their property, closest to Berry's Creek, removed hundreds of thousands of cubic yards to the westerly portion and installed a containment system. Because of filling, the Velsicol property is now somewhat upgrade from the Wolf property, between it and Berry's Creek. Whether the Wolfs' containment system will prove effective to seal off the massively contaminated upper layer of soil was not established at the time of the trial.
The trial judge determined that Wood Ridge, as owner and operator of the mercury processing plant, was guilty of discharges of mercury, a hazardous and toxic substance, into a *219 waterway of the State, in violation of N.J.S.A. 23:5-28, which was first enacted in 1937, and of the Water Quality Improvement Act of 1971, N.J.S.A., 58:10-23.1 to 23.10, which was repealed by the Spill Compensation and Control Act, effective April 1, 1977. Based on that determination, the trial judge, properly in our view, imposed liability against Wood Ridge for abatement of a public nuisance as defined by statute, Alpine v. Brewster, 7 N.J. 42, 50 (1951), as well as under the common law principle of strict liability for unleashing a dangerous substance during non-natural use of land. Rylands v. Fletcher, 3 H. & C. 774 (Exch. 1865), rev'd L.R. 1 Exch. 265 (1866), rev'd L.R. 3 H.L. 330 (1868); Bridgeton v. B.P. Oil, Inc., 146 N.J. Super. 169 (Law Div. 1976); U.S. v. FMC Corp., 572 F.2d 902 (2 Cir.1978).
As stated by the Exchequer Chamber in Rylands v. Fletcher:
We think the true rule of law is that the person who for his own purposes brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it at his peril, and if does not do so is prima facie answerable for all the damage which is the natural consequence of its escape.
The State had standing to maintain that common law action as the owner in fee of Berry's Creek, a tide-flowed estuary. O'Neill v. State Hwy. Dept., 50 N.J. 307 (1967).
The trial judge also determined that the Spill Compensation and Control Act of 1977 was not applicable to impose liability for discharges of mercury into a waterway of the State prior to its effective date. We disagree with that determination in view of the amendment to the act, effective January 23, 1980, which establishes that the DEP may undertake the cleanup and removal of a discharge of a hazardous substance occurring prior to the effective date of the Spill Compensation and Control Act "if such discharge poses a substantial risk of imminent danger to the public health or safety or imminent and severe damage to the environment," and that all cleanup and removal costs are the joint and several liability of those responsible for such discharges.
*220 The Spill Compensation and Control Act, N.J.S.A. 58:10-23.11g(c), as amended, provides:
Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing pursuant to subsection b. of section 7 of this act shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs.
The cross-reference to subsection b. of section 7 is to the subsection authorizing DEP cleanup and removal of hazardous substances which were discharged prior to the effective date of the act.
Discharges are defined in the act, N.J.S.A. 58:10-23.11b(h), as:
... any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substance into the waters of the State or onto lands from which it might flow or drain into said waters, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State.
There is no constitutional inhibition against retroactive application of the 1980 amendment to the Spill Compensation and Control Act to impose liability against Wood Ridge for its prior discharges of mercury into a waterway of the State, directly via waste effluents and indirectly via groundwater leaching and surface water run-off as the result of its dumping mercury-contaminated waste on the industrial site. The discharges were wrongful when made under the 1937 act, later under the 1971 act and, throughout Wood Ridge's operation of the mercury processing plant, under the common law principle of strict liability. The 1980 amendment did not create a new substantive liability. It was remedial only, providing a procedure for the imposition of costs to pay for the cleanup of prior wrongful discharges.
According to Pennsylvania Greyhound Lines, Inc. v. Rosenthal, 14 N.J. 372 (1954), which upheld the retroactive application of the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 et seq.:
The general rule is that statutes are to be deemed operative in futuro only; but, absent a clear indication of a legislative intent contra, a remedial and procedural statute is ordinarily applicable "to procedural steps in pending *221 actions," and is given retrospective effect "insofar as the statute provides a change in the form of remedy or provides a new remedy for an existing wrong.... Changes of procedure  i.e. of the form of remedies  are said to constitute an exception, but that exception does not reach a case where before the statute there was no remedy whatever." Shielcrawt v. Moffett, 294 N.Y. 180, 61 N.E.2d 435, 159 A.L.R. 971 (Ct. App. 1945). [at 381]
The Pennsylvania Supreme court has sustained the constitutionality of the application of the Clean Streams Act to impose liability to pay the costs of cleanup and removal of present pollution which was caused by acts occurring prior to the effective date of the act. National Wood Preservers v. Commonwealth, 489 Pa. 221, 414 A.2d 37 (Sup.Ct. 1980); Commonwealth v. Barnes & Tucker Co. (I), 455 Pa. 392, 319 A.2d 871 (Sup.Ct. 1974); Commonwealth v. Barnes & Tucker Co. (II), 472 Pa. 115, 371 A.2d 461 (Sup.Ct. 1977).
The issue of strict liability under the Spill Compensation and Control Act was adjudicated below, substantively but not procedurally. Wood Ridge was found to have dumped or otherwise emitted mercury, a hazardous substance, into Berry's Creek, a waterway of the State, and onto both the 33-acre and 7.1-acre tracts, from which mercury flowed or drained into Berry's Creek.
No factual finding was made that the condition existing in Berry's Creek poses a substantial risk of imminent danger to the public health or safety or imminent and severe damage to the environment warranting cleanup and removal under the 1980 amendment. But evidence was adduced on both sides of that fact question, which was fairly in issue before the trial court. In recognizing the grave danger to the environment, expert opinion on behalf of defendants did not significantly differ from expert opinion on behalf of DEP. We exercise our original jurisdiction under R. 2:10-5 to reach that factual finding, in view of the overwhelming evidence of mercury pollution in the sediments and waters of Berry's Creek and its substantial and imminent threat to the environment, to marine life and to human health and safety.
*222 The trial court fixed joint and several liability against Wood Ridge, applying both statutory law preceding the Spill Compensation and Control Act and common law. Under the 1980 amendment to the latter act, which established its retroactive application to prior discharges of hazardous substances, we hold that Wood Ridge also is jointly and severally liable pursuant to N.J.S.A. 58:10-23.11g(c).
No apportionment between Berk and Wood Ridge of the cost of cleanup and removal of mercury contaminants in Berry's Creek is calculable on the evidence. The total hazardous condition was found by the trial judge to be attributable in part to mercury discharges by Berk from 1929 to 1960 and in part to mercury discharges by Wood Ridge from 1960 to 1974. Under general tort principles, damages for a total injury or loss are assessable against each of two or more tortfeasors whose wrong was a substantial factor in proximately causing injury or loss, whenever the total injury or loss cannot be subdivided and liability for its several parts attributed and allocated to individual tortfeasors. Hill v. Macomber, 103 N.J. Super. 127 (App.Div. 1968); Prosser, Law of Torts (4 ed. 1971), § 52 at 313.
That general principle of tort damages is applicable, both in assessing damages for strict tort liability in accordance with Rylands v. Fletcher and, by analogy, in fixing joint and several liability for cleanup and removal costs under N.J.S.A. 58:10-23.11g(c). We affirm the adjudication below of joint and several liability against Wood Ridge for all cleanup and removal costs of mercury pollution in Berry's Creek.
The trial judge held that Ventron was severally liable for half the cleanup and removal costs only, equally apportioning liability between Velsicol and Ventron based, apparently, on the number of years when each was parent corporation of Wood Ridge during the latter's ownership and operation of the mercury processing plant.
*223 However, we hold that the trial judge erred in limiting Ventron's liability to several liability for half the cleanup and removal costs only. Wood Ridge merged into Ventron in 1974. Ventron assumed all Wood Ridge's liabilities, both expressly and under controlling corporation law, N.J.S.A. 14A:10-6(e), including liability for prior mercury discharges into Berry's Creek.
Ventron urges reversible error in the admission of the expert testimony of Dr. Jack McCormick on behalf of DEP, because it had previously retained him in connection with this litigation. It relies on the attorney-client privilege and on R. 4:10-2(d)(3).
Dr. McCormick's work for Ventron in testing and analysis of mercury contamination in Berry's Creek was, according to his agreement with Ventron, "not to be considered confidential." Dr. McCormick's subsequent investigation for DEP was independent and separately paid for. There was no indication or disclosure of any confidential admission by Ventron to Dr. McCormick for the purpose of his advising Ventron preparatory to trial. DEP notified Ventron that it had retained Dr. McCormick four months prior to any objection by Ventron. Meanwhile, Dr. McCormick had completed his investigation for DEP.
Under the circumstances the exclusion of the testimony of Dr. McCormick, a recognized preeminent expert in environmental and ecological engineering, would have been prejudicial to DEP. We agree with the trial judge that his testimony was not shielded by the attorney-client privilege nor under R. 4:10-2(d)(3), in the absence of any showing of breach of an exclusive agency or other confidential relationship or of fundamental unfairness.
Ventron also urges an estoppel against DEP because of its cooperative efforts to combat mercury pollution by Wood Ridge. In 1968 Ventron engaged Metcalf & Eddy, Inc. to make a study of mercury contamination in the waste effluents. In advance of any directive or order by DEP, it instituted treatment of the waste effluents, reducing significantly their mercury *224 content. It participated in soil and groundwater test sampling.
DEP granted no permit or formal approval to Ventron for Wood Ridge's waste effluent treatment system. At least from 1970 on, DEP communicated regularly its concern over mercury pollution and its dissatisfaction with the attempts to curb further discharges. Estoppel as a defense should not be applied against the State except to prevent "manifest wrong or injustice." In re Allstate Ins. Co., 179 N.J. Super. 581, 593 (App.Div. 1981). We do not apply estoppel against DEP on this record. Thus, we hold that Ventron is jointly and severally liable, based upon its assumption of Wood Ridge's liabilities, for all cleanup and removal costs of mercury pollution in Berry's Creek.
The trial judge also held that Velsicol was severally liable for half the cleanup and removal costs only. Nevertheless, his findings that Velsicol had knowledge of and accepted dumping of mercury-contaminated waste on its 33-acre tract after acquiring title in 1967 and that there were past and are current discharges of mercury in surface water run-offs from the Velsicol tract to Berry's Creek, warrant imposition of joint and several liability against Velsicol under the Spill Compensation and Control Act, premised upon its responsibility for both past and current mercury discharges which were a substantial factor in the total mercury pollution of Berry's Creek.
In addition, the trial judge pierced the corporate veil to impose liability against Velsicol for the wrongful discharges of Wood Ridge, its subsidiary corporation, from 1960 to 1968. The trial judge set forth factual findings, which were supported by adequate credible evidence in the record, and his conclusion, as follows:
... One must, in a public interest case, examine the nature of the business, the ability to control and the morality or immorality of a failure on the part of the parent company to act.

*225 Velsicol formed WRCC [Wood Ridge] to purchase the Berk operation in 1960. Berk was polluting. WRCC continued to pollute, Velsicol may not have known the consequences of the actions of WRCC but it did know, or should have known that chemical mercurial wastes were being discharged. Even if Velsicol had not, in fact, dominated the affairs of WRCC (and it did), it had the ability through its 100% stock ownership to control those acts of WRCC which might affect the public and the environment.
WRCC was created for the sole purpose of acquiring the assets of Berk and continuing the business. Velsicol was in a related and compatible business. Velsicol personnel, directors, and officers were constantly involved in the day-to-day operation of the business of WRCC. Quality control of WRCC was handled by Velsicol. In general, WRCC was treated as a division of Velsicol.
Velsicol's goal was economic gain. It used WRCC for that purpose. It must take the responsibility for the risks that accompany a business venture with environmental damage potential.
That conclusion is in accordance with Mueller v. Seaboard Commercial Corp., 5 N.J. 28, 34-35 (1950), which established that where "the affairs [of a wholly owned subsidiary corporation] are so organized and conducted as to make it a mere instrumentality" of its parent corporation, its separate corporate entity will be disregarded in order to prevent injustice.
Also corroborating Wood Ridge's relationship as a mere instrumentality or alter ego of Velsicol was the undisputed evidence that Velsicol in 1967 took title to the 33-acre tract without consideration, as a land dividend from Wood Ridge, and in 1968 sold all the capital stock of Wood Ridge to Ventron. Profits derived from Wood Ridge's operation of the mercury processing plant were reaped by Velsicol.
In our view it is immaterial that two of the factors cited as determinative of a parent corporation's liability for a wholly-owned subsidiary's torts, Annotation, "Torts of Subsidiary," 7 A.L.R.3d 1343 (1966), were not present: namely, grossly inadequate capitalization and substantially exclusive business with the parent corporation.
Under the factual circumstances found by the trial judge, as supplemented by other undisputed evidence, the separate corporate form of Wood Ridge, unless pierced, might be a shield behind which Velsicol would be immune from liability for operations *226 which is substantially controlled and from which it exclusively profited, resulting in massive mercury pollution to the public detriment and peril. We sustain the trial court in piercing Wood Ridge's corporate veil.
Velsicol argues, finally, that DEP should be estopped to proceed against it because Wood Ridge complied with then prevailing industry standards and DEP never brought any enforcement action against it during its operation of the mercury processing plant from 1960 to 1968; that it should be released from any liability because of Ventron's assumption of Wood Ridge's liabilities upon the merger in 1974, and that the statute of limitations, N.J.S.A. 2A:14-1 and 10, is a bar.
Estoppel is unavailable factually and legally in favor of Velsicol on this record as it is unavailable in favor of Ventron. Upon Wood Ridge's merger into Ventron, Ventron did not assume Velsicol's liabilities; it assumed only Wood Ridge's liabilities. N.J.S.A. 2A:14-1 and 10 are not by their terms applicable against the State, expressly or by necessary implication. Veterans Loan Auth. v. Wilk, 61 N.J. Super. 65, 70 (App.Div. 1960).
We hold that Velsicol is jointly and severally liable for all cleanup and removal costs of mercury pollution in Berry's Creek and for surfacing of its 33-acre tract to prevent further mercury discharges by surface water run-off into Berry's Creek.
DEP, in turn, appeals from the holding of the trial court exonerating the Wolfs from any liability for mercury pollution under both applicable statutes and common law.
The trial judge concluded that DEP had failed to prove that the Wolfs, by smashing pipes or otherwise, allowed mercury contaminants to reach Berry's Creek by run-off or drainage during demolition of the industrial buildings on the 7.1-acre tract, so as to add more than a de minimis increment to the total mercury pollution of Berry's Creek. The trial judge also rejected any finding that there is current groundwater leaching of mercury from the Wolf tract or that the containment system *227 installed by the Wolfs is not effective, in combination with the artificial land barrier between the Wolf tract and Berry's Creek.
DEP's only other theory of liability against the Wolfs is that their property is a statutory or common law nuisance because of mercury contamination. But the Wolfs have never operated a mercury processing plant on the site nor, according to the proofs, dumped mercury. We share the trial judge's view that any increment from the Wolfs' property to the mercury pollution in Berry's Creek during their ownership and prior to installation of the containment system was de minimis and, therefore, not a substantial factor in proximately causing the total dangerous and toxic condition. Accordingly, we affirm the dismissal of DEP's action against the Wolfs to impose liability for the costs of cleanup and removal of mercury pollution in Berry's Creek.
Ventron appeals from the judgment in the Wolfs' favor fixing liability on their cross-claim for fraudulent nondisclosure in the sale and conveyance of the 7.1-acre tract from Ventron to the Wolfs in 1974. The Wolfs cross-appeal from limitations on their ultimate damage recovery which are specified in the trial court's opinion and incorporated by reference in its judgment.
The trial judge found in accordance with credible evidence that Ventron had prior knowledge of a latent defect, gross mercury pollution in the soil, but intentionally failed to disclose it to the Wolfs, as attested by Ventron's supplying other data but not the Metcalf & Eddy report to the Wolfs, and that the Wolfs reasonably relied on the nondisclosure to their detriment, being forced by DEP to install the containment system. See Weintraub v. Krobatsch, 64 N.J. 445 (1974).
Ventron urges that caveat emptor should apply, that Mr. Wolf was an experienced real estate developer and that the Wolfs were on notice, about two weeks prior to the title closing, from the State Department of Labor that the industrial buildings on the site contained hazardous chemicals. But the nondisclosure was of latent, not patent, defects, and the notice of *228 hazardous chemicals within and adhering as residue to the industrial buildings did not put the Wolfs on notice of surface and subsurface contaminants. Accordingly, caveat emptor should not apply. Weintraub v. Krobatsch, supra. We affirm the judgment of liability in favor of the Wolfs against Ventron for fraudulent non-disclosure.
However, we disagree with the trial court's opinion insofar as it prescribes the limits of damages which the Wolfs may be awarded on their cross-claim. At this stage of the litigation no proof of damages has been adduced. We agree that the cost of the containment system may be recoverable, as well as the legal fees incurred by the Wolfs in defense of the action brought against them by DEP. But the Wolfs' recovery should include any proven diminution in the fair market value of the premises below the purchase price because of the nondisclosed mercury contamination, specifically, any proven diminution in excess of the cost of the containment system, for example, reflecting a ready, willing and able buyer's concern over contingent future liability under the Spill Compensation and Control Act.
Other issues raised on this appeal involve the Spill Compensation Fund. Contrary to the judgment below, the Fund may not make payments for costs of cleanup and removal of mercury pollution in Berry's Creek unless the administrator of the Fund determines that "adequate funds from another source are not or will not be available." N.J.S.A. 58:10-23.11f(e).
Velsicol and Ventron challenge the dismissal of their claims for indemnification from the Fund. Clearly, under the act, entities responsible for discharges of hazardous substances are not entitled to indemnification from the Fund. N.J.S.A. 58:10-23.11g(c). We affirm the dismissal of the Velsicol and Ventron claims for indemnification.
The trial court entered a supplemental Procedural Order Involving Remedy, subsequent to its judgment, which was appealed from by Velsicol and Ventron. The proposed future course of this litigation prescribed in that order is that DEP *229 prepare a plan for cleanup and removal of mercury pollution in Berry's Creek and submit it for approval to the United States Army Corps of Engineers, which has jurisdiction because Berry's Creek is a navigable waterway. The costs involved would be borne initially by DEP, but imposed ultimately against the defendants, subject to liability as part of the over-all costs of cleanup and removal. We agree to that extent with the Procedural Order Involving Remedy.
At oral argument before us DEP stipulated that any defendant subject to liability would be entitled to a plenary hearing on the cleanup and removal plan and its costs, subsequent to Army Corps of Engineers' approval. The Procedural Order Involving Remedy should be modified to so provide.
The trial court also ordered future monitoring of Berry's Creek at the initial expense of DEP. Both Velsicol and Ventron were ordered to post cash or a surety bond in the amount of $1,000,000 for "any future remedial measures and for monitoring which may be necessitated after the initial cleanup of Berry's Creek and surfacing of the Velsicol tract." The trial court provided for a monitoring period of one year, after which, if no further mercury pollution in prohibited concentrations occurred in Berry's Creek, Velsicol and Ventron were to be released from any further liability.
We affirm the provisions for future monitoring at the initial expense of DEP and for the posting of cash or a surety bond in the amount of $1,000,000 both by Velsicol and Ventron. Taking the view that future liability should not be resolved at this state of the litigation, we set aside the provision for the contingent release of Velsicol and Ventron after one year's future monitoring.
In keeping with the foregoing, we modify the judgment on liability to impose joint and several liability against both Velsicol and Ventron for the costs of cleanup and removal of mercury pollution in Berry's Creek; to set aside the limitation on damages to be awarded to the Wolfs on their cross-claim against *230 Ventron, except as limited herein; to set aside the provision that the Spill Compensation Fund is liable forthwith, and to set aside the provision for the contingent release of Velsicol and Ventron after one year's future monitoring. We otherwise affirm the judgment on liability.
We supplement the Procedural Order Involving Remedy to provide that any defendant subject to liability is entitled to a plenary hearing on the plan for cleanup and removal of mercury pollution in Berry's Creek and its costs, subsequent to Army Corps of Engineers' approval of the plan. We otherwise affirm the Procedural Order Involving Remedy.
We remand to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.