670 A.2d 67

MARIE MARSH, PETITIONER–APPELLANT, v. NEW JERSEY SPILL COMPENSATION FUND AND ENVIRONMENTAL CLAIMS ADMINISTRATION, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND ENERGY, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 1, 1995—Decided January 25, 1996.

622

Before Judges LONG and BROCHIN.

*Craig J. Huber* argued the cause for appellant (*Archer & Greiner,* attorneys; *Mr. Huber,* on the brief).

*Mark Oshinskie,* Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Deputy Attorney General, of counsel; *Mr. Oshinskie,* on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

The New Jersey Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 *et seq.,* prohibits the "discharge" of "hazardous substances," including petroleum products, into the environment. *N.J.S.A.* 58:10–23.11b(h) and (k), –23.11c; *Atlantic City Mun. Utilities Auth. v. Hunt,* 210 *N.J.Super.* 76, 84, 509 *A.*2d 225 (App.Div.1986). The Spill Act established the New Jersey Spill Compensation Fund, *N.J.S.A.* 58:10–23.11i, and has made the Spill Fund "strictly liable, without regard to fault, for all cleanup and removal costs and for all direct and indirect damages no matter by whom sustained" resulting from any prohibited "discharge." *N.J.S.A.* 58:10–23.11g(a). However, if the person who has incurred the cleanup or removal costs, or who has sustained the damages "has discharged a hazardous substance, or is in any way responsible for any hazardous substance," that person is "strictly

liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred," *N.J.S.A.* 58:10–23.11g(c)(1), and is not entitled to reimbursement from the Spill Fund for cleanup or removal costs or damages. *N.J.A.C.* 7:1J–2.7; *Tree Realty, Inc. v. Department of Treasury*, 205 *N.J.Super.* 346, 500 *A.*2d 1075 (App.Div.1985) (stating that a "responsible" person is ineligible to receive compensation from the Spill Fund); *State Dep't of Envtl. Protection v. Ventron Corp.*, 182 *N.J.Super.* 210, 228, 440 *A.*2d 455 (App.Div.1981) (same), *aff'd on other grounds*, 94 *N.J.* 473, 468 *A.*2d 150 (1983). If the Spill Fund contests a claim for "cleanup and removal costs," the claim is to be determined by an arbitrator whose decision is appealable to this court. *N.J.S.A.* 58:10–23.11n. *Cf. In re Thomas*, 278 *N.J.Super.* 580, 651 *A.*2d 1063 (App.Div.), *certif. denied*, 141 *N.J.* 95, 660 *A.*2d 1194 (1995).

The issues presented by the present appeal are whether or not the statutory arbitrator who decided this case was correct in his determination that the appellant, Marie Marsh, was a "person ... in any way responsible" for the discharge of the pollutants which contaminated her property and that she was therefore ineligible to receive reimbursement from the Spill Fund for her cleanup costs, which thus far have totalled approximately $41,531.87. For the following reasons, we conclude that there are factual issues material to whether Mrs. Marsh is a "responsible" person, but we hold that, as a matter of law, she is ineligible for reimbursement because she is a donee of the property from a "responsible person."

Mrs. Marsh's parents, Vincent and Mary Bernardo, acquired the property in question on June 7, 1968. Sole title vested in Mrs. Bernardo when her husband died on December 18, 1979. Since 1930, the previous owners leased it to one gasoline company or another for use as a gasoline station, and Mr. and Mrs. Bernardo continued to lease the property for that purpose until 1974.

Mrs. Marsh acquired the property by a gift from her mother in February 1991. Before accepting the gift, Mrs. Marsh knew that

her parents had leased the property for use as a gasoline station, but she did not know until after she had acquired the property that it contained underground gasoline tanks or that it was polluted by gasoline from those tanks. Those facts were disclosed by an investigation required by the municipality when Mrs. Marsh sought subdivision approval.

The arbitrator reached his decision by a procedure in the nature of summary judgment. He held that because Mrs. Marsh was an owner of the property, she was "responsible" within the meaning of *N.J.S.A.* 58:10–23.11g for any part of the pollution which occurred while she owned the property, that some part had occurred during her ownership, and that she could not sustain her burden of proving what part of the pollution had occurred before the property was deeded to her. Alternatively, he ruled that because Mrs. Marsh knew when she voluntarily accepted the property that her parents had previously leased it for use as a gasoline station, she was "responsible" for discharges of gasoline which occurred both before and after she acquired it. The arbitrator's decision also states that Mrs. Marsh was the owner of the underground gasoline tanks. Mrs. Marsh argues that that "finding may have been an additional basis for the arbitrator's ruling." However, because Mrs. Marsh's ownership of the tanks is immaterial to our decision, we will not attempt to decide whether the arbitrator's determination as to her ownership of the tanks was a basis for his decision.

On appeal, Mrs. Marsh argues that the arbitrator's determination that she is "responsible" within the meaning of *N.J.S.A.* 58:10–23.11g is legal error. She also contends his findings that she owned the tanks and that she could not demonstrate what portion of the discharge occurred prior to her ownership of the real property decide material issues of fact which should not have been decided by a summary procedure.

The New Jersey Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 *et seq.*, does not define "responsible" as the term is used in *N.J.S.A.* 58:10–23.11g(c)(1). After noting that omission,

the Supreme Court in *New Jersey Department of Environmental Protection v. Ventron Corp.*, 94 *N.J.* 473, 468 *A*.2d 150 (1983), stated:

> [T]he Legislature intended the Spill Act to be "liberally construed to effect its purposes." *N.J.S.A.* 58:10–23.11x. The subsequent acquisition of land on which hazardous substances have been dumped may be insufficient to hold the owner responsible. Ownership or control over the property at the time of the discharge, however, will suffice. *See State Dep't of Envtl. Protection v. Exxon Corp.*, 151 *N.J.Super.* 464, 470–74, 376 *A*.2d 1339 (Ch.Div.1977).
>
> [*Id.* at 502, 468 *A*.2d 150].

The issue before the Court to which the quoted statement is directed was whether Velsicol, one of the three principal defendants in the *Ventron* case, was a "responsible" party under the Spill Act and thereby liable for the cost of removing mercury pollution which had been seeping into Berry's Creek from a forty-acre tract of land for a number of years. *Id.* at 499–503, 468 *A*.2d 150. The trial court and our court had held that Velsicol was a "responsible" party. We reached that result by piercing Velsicol's corporate veil, ruling that it and its mercury processing subsidiary should be treated as a single entity for the purpose of determining liability under the Spill Act. The Supreme Court disagreed with our piercing the corporate veil, but it affirmed our holding that Velsicol was a "responsible" party. The Supreme Court's holding was based on Velsicol's own conduct. The *Ventron* opinion's discussion of the nature and legal implications of that conduct indicates that the Court's statement that "[o]wnership or control over the property at the time of the discharge . . . will suffice," 94 *N.J.* at 502, 468 *A*.2d 150, should not be taken literally.

Some background is necessary for an understanding of the facts which were material to the Court's holding. In 1960, Velsicol formed Wood Ridge Chemical Corporation as a wholly owned subsidiary to operate a mercury processing plant on the forty-acre tract. In 1967, Wood Ridge conveyed thirty-three acres of the tract to Velsicol and continued its mercury processing operations on a retained tract of approximately seven acres. In 1968, Velsicol sold all of the corporate stock of Wood Ridge to Ventron. Wood Ridge continued its processing operations on the site as a

subsidiary of Ventron until Ventron and Wood Ridge were merged in 1974. *Ventron, supra,* 94 *N.J.* at 483–85, 468 *A.*2d 150.

The Supreme Court determined that Velsicol was a "responsible" party, pointing out that "[f]rom 1967 to 1974, and thereafter, Velsicol could have controlled the dumping of mercury onto its own thirty-three-acre tract." *Id.* at 502, 468 *A.*2d 150. Instead, the Court explained, "[b]y permitting Wood Ridge, even after it became a Ventron subsidiary in 1968, to use that tract as a mercury dump, Velsicol made possible the seepage of hazardous wastes into Berry's Creek." Significantly, the Court stated its holding as follows: "*When viewed together,* those facts compel a finding that Velsicol was 'responsible' within the meaning of the Spill Act for the pollution that occurred from 1960 to 1968." *Ibid.* (emphasis added).

Robert and Rita Wolf were also defendants in *Ventron.* They purchased part of the polluted property from Ventron. *Ventron, supra,* 94 *N.J.* at 481, 468 *A.*2d 150. The trial court found and the reviewing courts affirmed that, although the Wolfs knew that the property had been the site of a mercury processing plant, they were unaware of the gross mercury pollution in the soil. *Id.* at 503–04, 468 *A.*2d 150. The trial court and this court both held that the Wolfs were not "responsible" parties because they had not added more than a *de minimis* increment to the pollution of Berry's Creek when they acquired the property. *Ventron, supra,* 182 *N.J.Super.* at 226–27, 440 *A.*2d 455. The Department of Environmental Protection (DEP) did not petition for certification to review the lower courts' holdings that the Wolfs were not liable for the costs of cleanup and containment, and the Supreme Court expressly noted that it was not considering the point. *Ventron, supra,* 94 *N.J.* at 493, 468 *A.*2d 150. The Supreme Court emphasized, however, that Wood Ridge and its corporate predecessor, "not Mr. and Mrs. Wolf, polluted the environment. During their ownership, the Wolfs have not continued to dump mercury and they have been responsible for only a minimal aggravation of the underlying hazardous condition." *Ibid.*

*Ventron*'s determination that some of the defendants were "in any way responsible for any hazardous substance," *N.J.S.A.* 58:10–23.11g(c)(1), and some were not, sheds light on the meaning of the statutory term, "responsible." Wood Ridge was "responsible" because it was itself a polluter. Velsicol was "responsible" because it knowingly permitted Wood Ridge to illegally discharge hazardous substances when it had the power, both as a landowner and as a corporate parent, to stop the polluting conduct. The Wolfs were not "responsible" because they did not cause the pollution and they stopped most of the runoff and leaching from the property after they had purchased it. The fact that *de minimis* quantities of a hazardous substance continued to make their way off the polluted property during the Wolf's ownership did not make them "responsible."

This court's decision in *State Dep't of Envtl. Protection v. Arky's Auto Sales,* 224 *N.J.Super.* 200, 539 *A.*2d 1280 (App.Div. 1988), confirms that mere ownership of polluted real estate does not make the owner "responsible" under the Spill Act for remedying the pollution. In *Arky's Auto,* the DEP sued Arky's Auto Sales, a corporation, and Norman and Stanley Arky, its sole stockholders, to recover the costs of removing buried hazardous contaminants from property owned by the corporation. In the early 1970's, Arky's Auto leased a six-acre portion of the property to an unrelated lessee. To the knowledge of Arky Auto's two stockholders, the lessee permitted another party to bury leaking steel drums containing hazardous materials both on the leased portion of the property and on the portion retained by the corporation. In 1977, Arky's Auto transferred the property to its two stockholders, and in 1981 they conveyed it back to the corporation. This court held Arky's Auto liable to the DEP on the following rationale:

> Spill Act liability of Arky's is premised upon its ownership of the unleased portion of the 22–acre tract, where the hole was excavated and the steel drums buried, and upon the surrounding circumstances, including its principals' awareness that used steel drums with poisonous and flammable contents were scattered about the adjoining leased premises, many leaking; that, because of that problem, various Municipal Court charges had been filed against it; and that the township engineer

had directed the removal of contaminated soil. Despite its knowledge and fore-
warning of an incipient pollution problem, [the corporation] did nothing, either by
way of supervision or of inquiry into the measures taken for cleanup and removal,
if any.

[*Id.* at 206–07, 539 *A.*2d 1280 (citation omitted) ].

Of particular significance for the present case is the fact
that our opinion held that the two principals of Arky's Auto were
not liable to the DEP as "responsible" parties under the Spill Act
despite their having owned the property individually between 1977
and 1981, and their knowing, or having been in a position to know,
that drums buried on their property were potential sources of
pollution. We declined to pierce the veil of their wholly owned
corporation, and we held that they were not liable because,
"[s]peculatively, buried drums may have leaked hazardous sub-
stances during that period [of their individual ownership] but
there is no factual record." *Id.* at 207, 539 *A.*2d 1280. Read
together with *Ventron,* the implication of this ruling is that, even
when a party knows or should know of a potential source of
pollution on his property, holding the owner "responsible" for
pollution requires proof of discharge of more than a *de minimus*
quantity of hazardous material during that person's ownership.

Furthermore, the Spill Act defines "discharge" of a hazard-
ous material, which is the statutory basis for liability, to require
some causal act or omission:

"Discharge" means *any intentional or unintentional action or omission* resulting
in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping
of hazardous substances into the waters or onto the lands of the State....

[*N.J.S.A.* 58:10–23.11b(h) (emphasis added) ].

Consequently, ownership alone, even during a period when more
than *de minimis* discharge occurs, is not sufficient to make the
owner liable. As *Ventron* indicates, some further action or omis-
sion of the owner must have contributed, *however remotely,* to
causing the discharge.

It should be emphasized, however, that, as the Supreme
Court declared in *In re Kimber Petroleum Corp.,* 110 *N.J.* 69, 85,
539 *A.*2d 1181, *appeal dismissed,* 488 *U.S.* 935, 109 *S.Ct.* 358, 102

*L.Ed.*2d 349 (1988), "A party even *remotely responsible* for caus-
ing contamination will be deemed a responsible party under the
[Spill] Act." (emphasis added). Because the Spill Act imposes
liability even on parties who have only a remote causative respon-
sibility for the discharge of hazardous materials, *State Dept. of
Environ. Protection v. Arlington Whse.*, 203 *N.J.Super.* 9, 495
*A.*2d 882 (App.Div.1985), held that the owners of such materials
who, as bailors, confided them to a warehouseman for storage,
were liable for the costs of remedying the contamination caused by
discharge of the materials during a fire at the warehouse. In *Tree
Realty, Inc. v. Department of Treasury, supra,* we held that a
property owner was "responsible" for pollution because it had
leased its premises to a solid waste facility that was, or should
have been, readily identifiable as a potential polluter. The lessor
had the opportunity to prevent or halt discharges of hazardous
materials by its lessee. Storage of hazardous materials in the
warehouse by their owners and failure of a lessor to act when it
knew or should have known of the danger of contamination were
each an "intentional or unintentional act or omission resulting in
the releasing, spilling, [and] leaking. . . ." of pollutants. Each of
these acts or omissions had a sufficient causative connection with
the subsequent discharge to make the bailors in *Arlington Ware-
house* and the lessor in *Tree Realty* "responsible" parties.

■ In the present case, Mrs. Marsh did not cause the pollu-
tion. She did not put the polluting materials on the site. She was
unaware of the underground tanks or the leakage until they were
discovered in an environmental investigation. Since she did not
own the property when it was leased to the polluter, she had no
capacity or obligation to exercise her authority as a lessor to
prevent or end the pollution. She had no power to do anything
constructive until she acquired the property.

■ However, if Mrs. Marsh failed to take preventive or reme-
dial action when she knew or should have known of the discharge,
that failure would constitute an "intentional or unintentional act or
omission," and render her ineligible for reimbursement. If she

should have known even before she acquired the property that it was likely to be the site of buried, leaking gasoline tanks, her statutory responsibility would depend on whether more than a *de minimis* quantity of hazardous substances was discharged during her ownership and whether she failed to end the pollution as promptly as reasonably possible. If those factual issues are decided adversely to Mrs. Marsh, she would be jointly and severally liable for all costs and damages which have resulted from discharges occurring both before and during her ownership, *N.J.S.A.* 58:10–23.11g(c)(1), and she would therefore be ineligible for reimbursement for any cleanup costs, whenever the spills to which they are attributable may have occurred. *Cf. Ventron, supra,* 94 *N.J.* at 503, 468 *A.*2d 150 (holding that Ventron and Velsicol were jointly and severally liable for all cleanup costs, including those attributable to the operations of their predecessors); *see* Senate Environmental Quality Committee Statement, Senate, No. 2657 and Assembly, No. 3639—*L.*1991, *c.* 372 ("Joint and several liability means that a person who is only partially responsible for the cost of a cleanup may be required to pay the entire amount."). If these issues were critical to the disposition of the case, a remand would be necessary.

If Mrs. Bernardo had made her gift of the subject property to her daughter after September 14, 1993, Mrs. Marsh would clearly have been a "responsible" party and therefore ineligible for reimbursement for cleanup costs by virtue of an amendment to *N.J.S.A.* 58:10–23.11g which applies to transfers made on or after that date. *See Historical and Statutory Notes* following *N.J.S.A.* 58:10–23.11g. In order to avoid being a "responsible" person under that statute as amended, a property owner on whose property there has been a discharge of a hazardous substance must prove, among other things, that the property was acquired after the discharge; that, if the person received the property other than by devise or succession, the transferee neither knew nor had reason to know of the discharge at the time of acquisition; and that the transferee immediately gave notice to the Department of Environmental Protection on notice of the discharge. To

establish lack of knowledge or reason to know of the discharge, the transferee "must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property." *N.J.S.A.* 58:10–23.11g(d)(2)(d). The parties' stipulation of facts indicates that Mrs. Marsh would be unable to satisfy all of these requirements.

The Department of Environmental Protection, referring to its regulations effective January 4, 1993, argues that even before the adoption of the 1993 amendment, a transferee was legally obligated to make a diligent inquiry in advance of acceptance of a transfer in order to be absolved from statutory responsibility. *See N.J.A.C.* 7:1J–1.1 *et seq.*, particularly *N.J.A.C.* 7:1J–1.2; –2.7(b). Our previously stated analysis of the law applicable to this case leads to the contrary conclusion and we therefore disagree with the Department's contention. To the extent that the regulations are inconsistent with the Spill Act as it existed prior to its 1993 amendment, they are inoperative with respect to transfers made before the effective date of that amendment. *See Smith v. Director, Division of Taxation,* 108 *N.J.* 19, 26, 527 *A.*2d 843 (1987) ("[A]dministrative regulations are not binding on the courts and a regulation will fall if a court finds that the rule is inconsistent with the statute it purports to interpret.")

Nonetheless, we hold that Mrs. Marsh is ineligible for cleanup costs on another ground. On the basis of the stipulated facts, Mrs. Bernardo clearly is a responsible party, liable for cleanup costs because she knew or should have known of the leaking tanks on her property long before she gave the land to Mrs. Marsh, and she failed to stop the leaks or remove the contamination. We will not interpret the Spill Act to permit a property owner who has profited by contaminating or permitting the contamination of property to obtain public financing for cleaning up the pollution by the expedient of making a gift of the property to her daughter or other close family member. Such an interpretation would produce an anomalous result inconsistent with the intent of the Act, even before its amendment. It would

hamper the State in its efforts to enforce the strict liability of dischargers and of persons "in any way responsible for hazardous substances." Whatever may have been Mrs. Bernardo's purpose, that would be the effect of her gift if we accepted appellant's interpretation of the law. Consequently, we hold that a donee's right to recover reimbursement from the Spill Fund is no greater than her donor would be entitled to.[1] Any other result would be inequitable and inconsistent with the purpose of the Spill Act.

The decision appealed from is therefore affirmed.

---

[1] The facts of this case make it unnecessary for us to decide whether a donee of property may be liable for cleanup costs in an amount greater than the value of the property, and we therefore have not decided that issue.