# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40128

United States Court of Appeals
Fifth Circuit

**FILED**

September 4, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

CITGO PETROLEUM CORPORATION; CITGO REFINING AND
CHEMICALS COMPANY, L.P.,

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, JONES, and CLEMENT, Circuit Judges.

EDITH H. JONES, Circuit Judge:

CITGO Petroleum Corporation and CITGO Refining and Chemicals Company, L.P. (collectively "CITGO") were convicted of multiple violations of the Clean Air Act, 42 U.S.C. § 7413 and 40 C.F.R. § 60.690 *et seq*. ("Subpart QQQ"), and the Migratory Bird Treaty Act of 1918 ("MBTA"), 16 U.S.C. § 703. CITGO urges this court to reverse the Clean Air Act convictions because the district court erroneously instructed the jury about the scope of a regulation concerning "oil-water separators." CITGO also contends that the MBTA convictions are infirm because the district court misinterpreted the century-old statute as covering unintentional bird kills. We essentially agree with both contentions and **REVERSE**.

No. 14-40128

## BACKGROUND

In the 1980s, the Environmental Protection Agency ("EPA") exercised its authority under Section 111 of the Clean Air Act, 42 U.S.C. § 7411, to regulate oil refinery wastewater treatment systems.[1]  These systems, the EPA explained, emit dangerous levels of volatile organic compounds ("VOCs"), such as xylene, toluene, and benzene.  Standards of Performance for New Stationary Sources; VOC Emissions From Petroleum Wastewater Systems [hereinafter "Proposed Standards"], 52 Fed. Reg. 16,334-01, 16,337 (May 4, 1987) (to be codified at 40 C.F.R. pt. 60).  When VOCs enter the atmosphere they cause photochemical reactions that produce ozone. *Id.* Ozone, a principal ingredient of urban smog, can trigger a variety of respiratory problems.  To mitigate the alleged health risks, the EPA sought to reduce the VOCs entering the wastewater system, reduce the surface area of wastewater exposed to the atmosphere, and control the venting of VOCs to the extent practicable. *Id.* at 16,337.

Understanding the ensuing regulations, however, requires a brief overview of the wastewater treatment process.  Wastewater—containing a mixture of solids, sludges, and oil—is an inevitable byproduct of the refining process.  U.S. ENVTL. PROT. AGENCY, VOC EMISSIONS FROM PETROLEUM REFINERY WASTEWATER SYSTEMS—BACKGROUND INFORMATION FOR PROPOSED STANDARDS [hereinafter "Background for Proposed Standards"], EPA-450/3-85-001a, at 3-3 (1985).  A series of drains located in different parts of the refinery collects the wastewater as it is generated. *Id.* From there, the water travels through lateral sewers into the first piece of oil separation equipment, aptly called an oil-water separator. *Id.* When wastewater enters the

---

[1] The EPA also regulates these systems under the Clean Water Act, *U.S. ex rel. Adm'r of EPA. v. CITGO Petroleum Corp.*, 723 F.3d 547, 549 (5th Cir. 2013), but the government did not charge CITGO with any CWA violations here.

separator, oils and solids with specific gravities less than that of water float to the top, while heavy sludges and solids sink to the bottom. *Id.* Skimmers then remove the top layer of floating oil for recycling. *Id.* Although these separators are the primary oil removal equipment, they are not designed to remove *all* the oil from wastewater; according to the EPA, oil-water separators can remove between fifty and ninety-nine percent of separable oil. *Id.* at 3-56. When the EPA promulgated the regulation at issue in 1987, there were three types of oil-water separators: the American Petroleum Institute ("API"), Corrugated Plate Interceptor ("CPI"), and Parallel Plate Interceptor ("PPI"). *Id.* at 3-28. The EPA considered CPIs, the type of separators used at CITGO's facility, "enhanced oil-water separators" because they are more efficient than the then-prevalent API separators. *Id.*

After wastewater passes through the oil-water separator it pools in large vessels called equalization tanks. By providing a way point between the oil-water separators and subsequent treatments, the tanks ensure that a constant and manageable amount of wastewater flows to secondary treatment systems. Background for Proposed Standards, *supra*, at 3-54. In other words, the equalization tanks increase the efficiency of downstream treatment processes by preventing large unpredictable discharges (which are common in refineries) from overwhelming those systems. *Id.* When oil accumulates in the tanks, skimmers and vacuum trucks extract the excess oil for recycling.

Next, wastewater undergoes air flotation. Gas and air are pumped into the wastewater. Background for Proposed Standards, *supra*, at 3-41. The gases then form bubbles that attach to suspended oil. *Id.* The combined oil-gas bubbles, with densities less than water, float to the top. *Id.* The resulting layer of oil can then be skimmed off and recycled. *Id.* From there, the wastewater undergoes biological treatment in an aerobic basin, then passes through a clarifier before finally being released. *Id.* at 3-53.

No. 14-40128

CITGO's Corpus Christi refinery fits this general description. Drains collect wastewater and transport it to two CPI oil-water separators. R. 7882. On average, the CPIs removed about 70 percent of separable oil. R. 7884-85; 7887. The water flowed from the separators into two large equalization tanks, referred to as Tanks 116 and 117, each measuring thirty-feet tall and 240 feet in diameter. When unpredictable discharges occurred, oil pooled in the equalization tanks, and CITGO used vacuum trucks and skimmers to remove the excess oil. R. 8463. Although the CPI oil-water separators had roofs, at the time of the alleged violations, Tanks 116 and 117 did not.

After a surprise inspection in March 2002 revealed 130,000 barrels of oil floating atop the uncovered equalization tanks, Texas environmental inspectors cited CITGO for violating the Clean Air Act.[2] Under Subpart QQQ, which resulted from the EPA's push to limit VOC emissions from oil refineries, all oil-water separators must have roofs. Because the equalization tanks contained such a large amount of oil, Texas authorities concluded CITGO was using Tanks 116 and 117 as oil-water separators. And because those tanks were uncovered, authorities concluded that CITGO was violating Subpart QQQ.

In 2007, a grand jury returned a ten-count indictment. R. 1572-87. As relevant here, the indictment accused CITGO in two counts of knowingly operating Tanks 116 and 117 as oil-water separators without emission control

---

[2] When Congress passed the Clean Air Act, it recognized that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Accordingly, the Clean Air Act places primary enforcement responsibility on the states. *See id.* § 7411(c). The federal government, however, retains secondary enforcement authority. The federal government, instead of Texas, exercising its secondary authority, prosecuted this case.

4

No. 14-40128

devices in violation of 42 U.S.C. § 7413(c)(1), and 40 C.F.R. § 60.692-4.[3]  *Id.* Because the government suspected birds had died in the uncovered tanks, the indictment also accused CITGO of "taking" migratory birds in violation of the MBTA, 16 U.S.C. § 703.[4]  *Id.*  The trial occurred in two parts.  In the first, a jury exonerated the defendants on three CAA counts but found CITGO guilty on the two above-noted counts.  CITGO moved to set aside the verdict, arguing, *inter alia*, that the district court's jury instruction misinterpreted Subpart QQQ.  R. 2365-78.  The district court denied the motion.  *See United States v. CITGO Petroleum Corp.* (*Clean Air Act Opinion*), No. C-06-563, 2011 WL 1155684, at *1 (S.D. Tex. March 28, 2011).  In the nonjury phase of the trial, the district court found CITGO guilty of three (out of five) counts for "taking" migratory birds.  R. 11168-71.  The district court denied CITGO's motion to vacate these convictions.  *United States v. CITGO Petroleum Corp.* (*MBTA Opinion*), 893 F. Supp. 2d 841 (S.D. Tex. 2012).  The court sentenced CITGO to a $2 million fine for the Clean Air Act counts and $15,000 for each MBTA violation.  CITGO now appeals.

## DISCUSSION

CITGO presents three challenges to its convictions, only two of which need discussion.  First, CITGO challenges the jury instruction that an oil-water separator is any equipment used to separate oil from water.  Second, CITGO

---

[3] In addition to the Clean Air Act and MBTA counts, counts one and two charged CITGO with emitting benzene in excess of the allowed amount under Section 112 of the Clean Air Act. R. 1572-87.  Count three alleged that CITGO and its Environmental Manager made false statements to authorities.  *Id.*  The jury found CITGO not guilty on counts one and two. The district court dismissed count three as time-barred.

[4] Among the bird remains were five White Pelicans, twenty (regular old) Ducks, two Northern Shoveler Ducks, four Double Crested Cormorants, one Lesser Scaup Duck, one Black-Bellied Whistling Tree Duck, one Blue-Winged Teal Duck, and one Fulvous Whistling Tree Duck.

5

No. 14-40128

argues that the MBTA only criminalizes acts related to hunting or poaching, not omissions that unintentionally kill birds.[5]

I.

CITGO's challenge to the jury instructions rests on one question: under Subpart QQQ, can an equalization tank be an oil-water separator? The district court thought it could. The jury instructions quoted Subpart QQQ's definition of an oil-water separator and then added: "[t]he definition of oil-water separator does not require that [it] have any or all of the ancillary equipment mentioned such as forebays, weirs, grit chambers, and sludge hoppers . . . . An oil-water separator is defined by how it is used." *Clean Air Act Opinion*, 2011 WL 1155684, at *3. This purely functional explanation is not what Subpart QQQ says, however: it defines an oil-water separator by how it is used *and* by its constituent parts. Nor does the district court's interpretation comport with other regulations governing wastewater treatment systems or Subpart QQQ's promulgation history. Although the jury was also provided the exact text of Subpart QQQ, the court's instruction told them what it means and thus undoubtedly affected the verdict. For this harmful error, the Clean Air Act convictions must be reversed.

The district court has "substantial latitude . . . in describing the law to the jury." *United States v. Williams*, 610 F.3d 271, 285 (5th Cir. 2010). This court only evaluates "whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Orji-Nowsu*, 549 F.3d 1005, 1008 (5th Cir. 2008). In other words, this court

---

[5] The third issue is whether this prosecution violated CITGO's due process rights because the EPA changed its interpretation of Subpart QQQ without notice. Because we hold that Subpart QQQ does not govern Tanks 116 and 117, we need not address CITGO's constitutional argument.

No. 14-40128

reviews jury instructions for abuse of discretion. *United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009). The legal conclusions underlying jury instructions, however, are reviewed *de novo*. *See Williams*, 610 F.3d at 285.

A.

This court applies the same interpretive framework to regulations as to statutes. *KCMC, Inc. v. F.C.C.*, 600 F.2d 546, 549 (5th Cir. 1979). The discussion begins, as it always must, with Subpart QQQ's text. Further, where, as here, a regulatory violation carries criminal penalties, the regulation "must be strictly construed and cannot be enlarged by analogy or expanded beyond the plain meaning of the words used." *United States v. Clark*, 412 F.2d 885, 890 (5th Cir. 1969); *accord United States v. Anzalone*, 766 F.2d 676, 680 (5th Cir. 1985); *Diamond Roofing Co., Inc. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976) ("If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express").

An oil-water separator, the regulation explains, is wastewater treatment equipment:

> used to separate oil from water consisting of a separation tank, which also includes the forebay and other separator basins, skimmers, weirs, grit chambers, and sludge hoppers. Slop oil facilities, including tanks, are included in this term along with storage vessels and auxiliary equipment located between individual drain systems and the oil-water separator. This term does not include storage vessels or auxiliary equipment which do not come in contact with or store oily wastewater.

40 C.F.R. § 60.691. The parties concentrate their arguments on the first sentence of this paragraph. The government advances several arguments why this sentence invokes a quintessentially functional approach to defining an oil-water separator. As the district court put it, "an oil-water separator is defined by how it is used." The government contends that because the first sentence

7

of this definition does not require a regulated piece of equipment to include the various devices listed in the latter half of the sentence, and because the government proved that CITGO "used" Tanks 116 and 117 "primarily" to separate oil from water, the violations and convictions must be sustained.

To examine the government's position, it is helpful to look at a diagram of a CPI oil-water separator that EPA included in its Background discussion before Subpart QQQ was promulgated and was admitted into evidence.



Notably, the definition in Subpart QQQ exactly describes this diagram. All of the components listed in Subpart QQQ (separation tank, forebay, other separation basin, skimmers, weirs, grit chamber, and sludge hopper) are identifiable on the diagram, and they are components of the separators as described by EPA. *See* Background for Proposed Standards, *supra*, at 3-30.

On its face, then, the regulation clearly encompasses CPI oil-water separators of the sort that were upstream from CITGO's equalization tanks and air flotation device at its Corpus Christi refinery. The question is whether this language covers more than CPI and similar oil-water separators. The first sentence sets out two requirements. Obviously, the equipment covered by

No. 14-40128

Subpart QQQ must be "used to separate oil from water." Second and more critically, the equipment "consist[s] of" certain parts—that is, an oil-water separator is "composed or made up of" particular things. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 484 (1981). In addition to the separator's function, the second element of the sentence explains that an oil-water separator is made up of (or composed of) "a separation tank, . . . skimmers, weirs, grit chambers, and sludge hoppers. When used in this way, "consists" introduces an exhaustive list; the listed components are part of the definition of the oil-water separator. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 132-33 (2012); BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 440 (2003). Although Tanks 116 and 117 had skimmers, it is undisputed that they did not have weirs, grit chambers, or sludge hoppers. Therefore, they are not oil-water separators under Subpart QQQ, and CITGO cannot be guilty of violating Subpart QQQ.[6]

The EPA, nevertheless, urges us to reject this straightforward reading. In the EPA's view, Subpart QQQ's list of parts is governed, not by the phrase "consisting of," but by "includes." "Includes," in the words of the district court, is "inclusive, but not mandatory" and distinct from "consisting of." *Clean Air Act Opinion*, 2011 WL 1155684, at *4. Accordingly, the phrase "which also includes" and the list of parts that follows explain "whether or not ancillary equipment is included in the term [oil-water separator] for purposes of the regulation." *Id.* The phrase does not mean that the listed equipment is

---

[6] Although it may be possible to conclude that equipment lacking some listed parts is what an oil-water separator "consists" of, the canon of constitutional avoidance precludes this interpretation. Under this rule, courts must "avoid an interpretation of a [regulation] that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864, 109 S. Ct. 2237, 2241 (1989).

necessary for the regulation to be invoked. *Id.* The district court reasoned that CITGO's interpretation would render "includes" superfluous and would redefine the regulation to state something like, "'Oil-water separator' means wastewater treatment equipment used to separate oil from water consisting of a separation tank, the forebay and other separator basins, skimmers, weirs, grit chambers, and sludge hoppers." *Id.*

Although we agree that "includes" is inclusive, we disagree that "includes" governs and renders merely descriptive, not prescriptive, Subpart QQQ's list. Instead, "includes" governs the relative clause beginning with "which" and extending to "other separator basins." To see why requires a close parsing of the sentence. The relative pronoun "which" refers to the noun immediately preceding it—"separation tank." *See* THE CHICAGO MANUAL OF STYLE § 5.57 (16th ed. 2010) (explaining that generally a relative pronoun's antecedent immediately precedes it). Read together, the phrase "which also includes" expands the description of a separation tank to include the other tanks, or basins, where the entirety of the CPI separation process occurs. As the above diagram shows, a CPI oil-water separator has three such places— the forebay, the separation tank, and the outlet basin. Because all of these share the characteristic of being a tank or basin, it is grammatically accurate for the relative clause to expand the definition of "separation tank." Accordingly, the most logical reading of the relative clause is that it expands the definition of a separation tank to include all the spaces where separation can occur.[7]

---

[7] In fact, when the EPA promulgated the final version of Subpart QQQ, it placed the relative clause in parentheses in the preamble. *See* Standards of Performance for New Stationary Sources; VOC Emissions from Petroleum Refinery Wastewater Systems [hereinafter "Final Standards"], 53 Fed. Reg. 47,616-01, 47,616 (Nov. 23, 1988) (to be codified at 40 C.F.R. pt 60) ("Oil-water separators include the separation tank (which also includes the forebay and other separation basins), skimmers, weirs, grit chambers, and sludge

No. 14-40128

B.

This reading harmonizes Subpart QQQ's definition with its substantive requirements. The regulation requires refineries to cover oil-water separators. A CPI oil-water separator is configured such that it is possible to cover one basin or tank without covering the other two. In fact, during the notice and comment period, one commenter suggested that only the forebay, where most oil recovery takes place, should have a roof. U.S. ENVTL. PROT. AGENCY, VOC EMISSIONS FROM PETROLEUM REFINERY WASTEWATER SYSTEMS—BACKGROUND INFORMATION FOR PROMULGATED STANDARDS [hereinafter "Background for Promulgated Standards"], EPA-450/3-85-001b, at 2-30 (1987). Subpart QQQ, as we interpret it, requires refineries to cover the separation tank, the forebay, and other separation basins that are present. None of the language of Subpart QQQ is superfluous, and the limitations intended by EPA, according to its published commentary during the rulemaking process, are embodied in this language.

At the same time, it would be nonsensical to assert, as the government does, that Subpart QQQ explains that all listed parts, if present, must be covered. The above diagram is again instructive. Many of the parts listed in Subpart QQQ either cannot be covered individually (weirs, skimmers) or are wholly contained within the separation chamber, forebay, or outlet basin. Only three general areas of an oil-water separator can be covered, and the clause "which also includes the forebay and other separator basins" identifies those three areas. The rest of the parts listed are what an oil-water separator "consists of" and, therefore, are required for equipment to fall within the definition.

---

hoppers."). Although not dispositive, this certainly supports reading the relative clause to end after "other separation basins."

No. 14-40128

EPA's additional arguments for a purely functional interpretation of this regulation can be briefly disposed of. We disagree with EPA's contention that the second and third sentences of the regulation enhance a purely functional definition. The second sentence refers only to slop oil facilities and tanks located between individual drain systems (which are upstream) and the oil-water separator; Tanks 116 and 117 are not slop oil tanks under the regulatory definition and they are downstream of the CPI separators. EPA's "process" argument, that this regulation covers the entire process of oil-water separation, is contradicted by two facts. First, EPA routinely described equalization tanks, which sit downstream of the CPI separators, as a part of the air flotation system, and it excluded both from the final regulation in this subpart. Background for Promulgated Standards, *supra*, at 1-1. Second, because nearly every piece of equipment in a refinery's wastewater treatment system is used to separate oil from water (*e.g.* flocculation tanks, filtration tanks, clarifiers), the process argument proves too much: EPA could have written a much simpler regulation if it planned to require covers over the entire system rather than with definitional precision.

The government's functional, purportedly all-inclusive interpretation is also flawed because it conflicts with Subpart Kb, which regulates storage vessels excluded from Subpart QQQ. 40 C.F.R. § 60.692-3(d). Regulations, like statutes, must be "construed so that effect is given to all [their] provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009). Subpart Kb specifically governs storage vessels used in the wastewater treatment system. 40. C.F.R. § 60.110b(a). And like Subpart QQQ, it requires equipment emitting large amounts of VOCs to have roofs. *Id*. § 60.112b(a). But unlike Subpart QQQ, Subpart Kb requires the storage vessels to be covered only if they have a vapor pressure above certain threshold amounts. *Id*. The district court's

interpretation of Subpart QQQ, however, effectively eliminates Subpart Kb's vapor pressure trigger.  In its view, essentially all vessels that are part of the treatment system must be covered, no matter their vapor pressure.  Yet all such vessels are in some sense used to separate oil from water.  If their "use," or even "primary use" in oil-water separation is enough to trigger Subpart QQQ's requirement, this interpretation renders Subpart Kb's vapor pressure triggers inoperative.  Basic rules of interpretation require avoiding this result.

The interpretation of Subpart QQQ adopted here gives effect to both Subpart QQQ and Subpart Kb.  For Subpart QQQ to govern a vessel it must have the parts listed in the definition of an oil-water separator—a separation chamber or chambers, skimmers, weirs, grit chambers, and sludge hoppers.  In practical terms, Subpart Kb governs equalization tanks, like Tanks 116 and 117, which (except for skimmers) do not have those parts, while Subpart QQQ governs oil-water separators, like the Corpus Christi refineries' two CPI oil-water separators.

The government has not responded to this holistic harmonization of its own regulations.  Indeed, until now, the government read Subpart QQQ and Subpart Kb exactly the same way.  In response to an inquiry from a refinery operator, the EPA announced that "since [equalization] tanks are subject to . . . Subpart Kb . . ., they are not regulated by Subpart QQQ."  U.S. Envtl. Prot. Agency Applicability Determination Index, Control No. 0100058, Letter from R. Douglas Neeley, Chief, Air & Radiation Tech. Branch, Air, Pesticides, & Toxics Mgmt. Div., to Timothy S. Owen, Chief, Eng'g Servs. Branch, Air Div., Alabama Dep't of Envtl. Mgmt., Aug. 17, 2001.  Even more confounding to its present contentions, the EPA explained that "the Subpart QQQ definition of an 'oil-water separator' . . . [is] associated with API separators or enhanced

13

separators such as CPI separators." *Id.* In other words, Subpart QQQ governs CPI and API (and presumably PPI) separators, not equalization tanks.[8]

## C.

Ordinarily, when a regulation is clear and unambiguous—as Subpart QQQ is—there is no reason to discuss its promulgation history. *See United States v. Gonzales*, 520 U.S. 1, 6, 117 S. Ct. 1032, 1035 (1997). The parties, however, spent considerable time analyzing the history, which to the extent relevant, further supports our conclusion that equalization tanks are not oil-water separators and that Subpart QQQ only covers the latter.

Subpart QQQ, as originally proposed, was much broader than the enacted version. At that time, EPA explained that "refinery wastewater systems are highly interrelated sources of VOC emissions." Proposed Standards, 52 Fed. Reg. at 16,335. As a result, EPA concluded, emission controls on the entire wastewater system are "environmentally prudent" and "within the range of range of reasonable costs." *Id.* Thus, the proposed Subpart QQQ regulated "all the emission points . . . that are functionally related; that is, each individual drain system together with its ancillary downstream treatment components (including sewer lines, oil-water separators and air flotation systems)." *Id.* In essence, proposed Subpart QQQ governed what the EPA wishes it governed now—every part of the wastewater treatment system "from which VOC vapors might be emitted." *Id.*

Several refinery operators, including CITGO, commented on the proposed regulation. *See* Background for Promulgated Standards, *supra*, at 1-

---

[8] The EPA is not the only government agency to take this position. In 1999, three years before the 2002 inspection, Texas environmental inspectors first cited CITGO for operating Tanks 116 and 117 as oil-water separators. During the ensuing investigation, Texas officials concluded that CITGO's position—that Tanks 116 and 117 are not oil-water separators under Subpart QQQ—was correct. R. 5152. Accordingly, Texas dropped all the charges.

1, 1-2. As previously mentioned, one commenter suggested that the regulation only require a roof over the oil-water separator's forebay. *Id* at 2-30. Many commenters objected to the requirement that air flotation systems have roofs because they are not cost effective, they increase the risk of explosions and fire, and impair the efficiency of the wastewater treatment system. *Id* at 2-7. Another commenter complained about Subpart QQQ's applicability to equalization tanks, like Tanks 116 and 117. *Id*. at 2-8. According to the commenter, covering these tanks is difficult and presents the same safety concerns as covering the air flotation system itself. *Id*.

In response, the EPA undertook a thorough reevaluation of Subpart QQQ and made substantial changes. The final version was drafted to exclude air flotation systems. The "safety concerns raised by commenters," the government explained, "cannot be overcome in a cost effective manner." Background for Promulgated Standards, *supra*, at 1-2. And, under the best case scenario, covering the air flotation system would result only in a "negligible" reduction in VOC emissions. *Id*. "[F]or the same reasons" the final regulation excluded "equalization basins and other auxiliary tanks, basins, and equipment between the oil- water separator and air flotation system." *Id*. As with air flotation systems, "there are no cost-effective methods of VOC emissions destruction or removal that have been demonstrated for these facilities. Further, suppression of VOC emissions at these points in the treatment process merely suppresses temporarily the VOC's downstream to be emitted at other uncontrolled locations." *Id*.

This history points to the same conclusions as Subpart QQQ's text: Subpart QQQ governs oil-water separators but not equalization tanks. In numerous places, the government unequivocally stated exactly that. At no point did the government warn that any equipment, if used to separate oil from water, would be regulated. And if it had, such statement would conflict with

the regulation's text. Further, under the government's reading, Subpart QQQ also governs systems the EPA explicitly exempted, like air flotation systems. Those systems are "commonly used in refinery wastewater treatment systems to remove free oil . . . [and] emulsified oil." Background for Proposed Standards, *supra*, 3-41. Yet "the final standards [were] revised to exempt air flotation systems." Background for Promulgated Standards, *supra*, at 2-7.

The government offers no rebuttal to this argument. Its brief merely repeats that Tanks 116 and 117 "were the separation tanks," the "primary means of separating slop oil out of its wastewater system," and were not "use[d] . . . as equalization basins." Noticeably absent is an acknowledgment of the consequences of its preferred interpretation. Nowhere does the government offer any limiting principle or admit to a changed view. Instead it presses an interpretation that results in Subpart QQQ's covering the entire wastewater treatment system, never mind that in every public pronouncement it took the contrary view. We agree with what the government has said from the beginning— Subpart QQQ does not regulate equalization tanks.

### D.

The government's warning that this court's reading of Subpart QQQ creates a "massive loophole," allowing refineries to "avoid emissions controls merely by eliminating an ancillary part from a separation tank's design," is unpersuasive. For one thing, our interpretation does not leave equalization tanks *unregulated*; Subpart Kb still applies. Significantly, the government has never charged CITGO with violating Subpart Kb. For another, the EPA has all the tools needed to fix any loopholes arising from this decision. Through the Clean Air Act, Congress has given the EPA power to write regulations with the binding force of law and backed by civil and criminal penalties. The EPA retains the ability to rewrite the regulations, if necessary and appropriate.

Subpart QQQ's text, the overall regulatory scheme, and its promulgation history point to the inescapable conclusion that an equalization tank is not an "oil-water separator."  To be an "oil-water separator" the equipment must be used to separate oil from water and it "consist" of a separation tank, which may have several basins, and skimmers, weirs, grit chambers, and sludge hoppers. Because the district court misstated the scope of the regulation, its jury instruction was erroneous.  There is no doubt that this omission affected the outcome.  CITGO's CAA convictions must accordingly be reversed.

## II.

We now turn to the MBTA convictions.  A century ago, out of a shared desire to "sav[e] from indiscriminate slaughter and [to] insur[e] the preservation of such migratory birds as are either useful to man or are harmless" the United States and the United Kingdom (on behalf of Canada) agreed to "adopt some uniform system of protection."  Migratory Bird Protection Agreement, U.S.-Can., Dec. 8, 1916, 39 Stat. 1702.  To implement the new accord, Congress passed the Migratory Bird Treaty Act of 1918.  As relevant here, the act makes it "unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill . . . any migratory bird,"  in violation of regulations and permits. *See* 16 U.S.C. § 703(a); § 704(a).  The act imposes strict liability on violators, punishable by a maximum $15,000 fine and six months imprisonment. 16 U.S.C. § 707(a).

In order to hold CITGO liable for three misdemeanor counts of "taking" migratory birds who died when they landed on Tanks 116 and 117, the district court conscientiously canvassed conflicting case law under the MBTA and drew three significant conclusions.  First, the court held that an illegal "taking" is an ambiguous term that involves more activities than those related to hunting, poaching and intentional acts against migratory birds.  *See MBTA Opinion*,

No. 14-40128

893 F. Supp. 2d at 843–45.  Second, the court held that strict liability requires, in this context, only that the actor proximately caused the illegal "taking."  *Id.* at 847.  Third, the court apparently held that CITGO's violation of federal and state regulations that required roofing these tanks could support the company's misdemeanor convictions.  *Id.*

On appeal, the government supports the first two conclusions, but CITGO asserts that illegally "taking" migratory birds involves only "conduct intentionally directed at birds, such as hunting and trapping, not [ ] commercial activity that unintentionally and indirectly causes" migratory bird deaths.  Albeit with significant nuances in reasoning, cases can be found to support either position.[9]  *Compare Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997), *and Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir. 1991), *with United States v. Apollo Energies, Inc.*, 611 F.3d 679, 686 (10th Cir. 2010); *and United States v. FMC Corp.*, 572 F.2d 902, 905 (2d Cir. 1978).  Reviewing this legal question *de novo, see United States v. Morgan*, 311 F.3d 611, 613 (5th Cir. 2002), we agree with the Eighth and Ninth circuits that a "taking" is limited to deliberate acts done directly and intentionally to migratory birds.  Our conclusion is based on the statute's text, its common law origin, a comparison with other relevant statutes, and rejection of the argument that strict liability can change the nature of the necessary illegal act.  Accordingly, CITGO's MBTA convictions must be reversed.

---

[9] District courts are similarly divided.  *Compare Mahler v. U.S. Forest Serv.*, 927 F. Supp. 1559, 1574 (S.D. Ind. 1996) (limiting MBTA to hunting like activities) *with United States v. Moon Lake Elec. Ass'n*, 45 F. Supp. 2d 1070, 1078-79 (D. Colo. 1999) (holding the opposite).

No. 14-40128

A.

CITGO was indicted for "taking" or "aiding and abetting the taking" of migratory birds, not for "killing" them.[10] We confine analysis to the charging term. The term "take" is "as old as law itself." *Babbitt v. Sweet Home Chapter Cmtys for a Great Or.*, 515 U.S. 687, 717, 115 S. Ct. 2407, 2422 (1995) (Scalia, J., dissenting); *see also* 2 WILLIAM BLACKSTONE, COMMENTARIES *411 (tracing the "right of pursuing, taking, and destroying" game back to Roman imperial law). Justice Scalia's discussion of "take" as used in the Endangered Species Act is not challenged here by the government, nor was it criticized by the majority in *Sweet Home*, because Congress gave "take" a broader meaning for that statute. *See Sweet Home*, 515 U.S. at 698 n.10, 115 S. Ct. at 2413 n.10. "[A]bsent contrary indications," courts presume that "Congress intends to adopt the common law definition of statutory terms." *United States v. Shabani*, 513 U.S. 10, 13, 115 S. Ct. 2407, 2422 (1995). As applied to wildlife, to "take" is to "reduce those animals, by killing or capturing, to human control." *Sweet Home*, 515 U.S. at 717, 115 S. Ct. at 2422 (Scalia, J., dissenting); *accord Geer v. Connecticut*, 161 U.S. 519, 523, 16 S. Ct. 600, 602 (1896), *overruled on other grounds by Hughes v. Oklahoma*, 441 U.S. 322, 99 S. Ct. 1727 (1979); *Ward v. Race Horse*, 163 U.S. 504, 507, 16 S. Ct. 1076, 1077 (1896). One does not reduce an animal to human control accidentally or by omission; he does so affirmatively.

The government disputes that the common law definition is so limited. Its brief asserts that, at the time Congress passed the act, "take" was not

---

[10] Although this case does not present an opportunity to interpret "kill," there is reason to think it too is limited to intentional acts aimed at migratory birds. At least one court has questioned whether "kill" has any independent meaning or is "only mentioned as the usual result of pursuing, hunting, or capturing." *United States v. FMC Corp.*, 572 F.2d 902, 903 n.1 (2d Cir. 1978). A contemporary statute, the Migratory Bird Conservation Act, 16 U.S.C. § 715, similarly intimates that "kill" may have little independent force, as it lists "kill" as

limited to hunting and trapping and that it had a wide variety of contemporaneous meanings. For support, the government looks to *United States v. Moon Lake Elec. Ass'n*, 45 F. Supp. 2d 1070, 1078-79 (D. Colo. 1999), which lists every possible meaning for that term contained in the 1920 edition of Webster's dictionary. That "take" *can or might have had* a wide range of meanings is not determinative, because when the MBTA was passed in 1918, "take" was a well-understood term of art under the common law when applied to wildlife. *See Geer*, 161 U.S. at 523, 16 S. Ct. at 602. The government does not explain why Congress implicitly intended to vary from the common law meaning in the MBTA. *See Shabani*, 513 U.S. at 13, 115 S. Ct. at 384.[11]

A simple comparison with related statutes, both enacted fifty or more years later, shows that Congress well knew how to expand "take" beyond its common law origins to include accidental or indirect harm to animals. The Endangered Species Act ("ESA") explicitly defines "take" to mean "*harass*, *harm*, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (emphasis added). The inclusion of "harass" and "harm" modified the common law definition. The term "harass," as interpreted by the ESA's regulations, includes not just intentional acts, but a "negligent act or omission." 50 C.F.R. § 17.3; s*ee also Sweet Home*, 55 U.S. at 707, 115 S. Ct. at 687 (approving this expansive

---

part of the definition of "take." *See* 16 U.S.C. § 715n. Even if "kill" does have independent meaning, the Supreme Court, interpreting a similar list in the ESA, concluded that the terms pursue, hunt, shoot, wound, kill, trap, capture, and collect, generally refer to deliberate actions. *Sweet Home*, 515 U.S. at 698 n.11, 115 S. Ct. at 2413. Accordingly, there is reason to think that the MBTA's prohibition on "killing" is similarly limited to deliberate acts that effect bird deaths.

[11] The government raises a straw man by arguing that "take" must mean more than the common law definition because the MBTA also regulates commercial activities concerning migratory birds. There is no linguistic connection between "taking" and the commercial exploitation of the birds and their eggs under MBTA. Moreover, the government's argument is at odds with the common law definition of "take" in the MBTA regulations. *See* 50 C.F.R. § 10.12.

reading of "take"). Similarly, "harm" encompasses not only acts that directly result in the death of endangered species, but also any "act which actually kills or injures wildlife." 50 C.F.R. § 17.3. In the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1372(a), Congress also chose to define "take," differently from the common law, to mean "*harass*, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). The accompanying regulations again interpret "harass" (and therefore "take") to include negligent acts that indirectly disturb or molest a marine mammal. 50 C.F.R. § 216.3. The absence from the MBTA of terms like "harm" or "harass", or any other language signaling Congress's intent to modify the common law definition supports reading "take" to assume its common law meaning.

The MBTA adds that the covered activities—pursuit, hunt, taking, capturing, killing—are illegal if committed "at any time, by any means, in any manner." 16 U.S.C. § 703(a). The addition of adverbial phrases connoting "means" and "manner," however, does not serve to transform the nature of the activities themselves. For instance, the manner and means of hunting may differ from bowhunting to rifles, shotguns, and air rifles, but hunting is still a deliberately conducted activity. Likewise, rendering all-inclusive the manner and means of "taking" migratory birds does not change what "take" means, it merely modifies the mode of the take.

The government does not refute this exegesis, at least not directly. Instead, it argues that Congress expanded the definition of "take" by negative implication. The argument goes like this: In 2002, a district court held that the United States military violated the MBTA when migratory birds were accidentally killed during training exercises in the Pacific. *Ctr. for Biological Diversity v. Pirie,* 161 F. Supp. 2d 161, 163-64 (D.D.C. 2002), *vacated as moot sub nom. Ctr. for Biological Diversity v. England,* No. 02-5163, 2003 WL

179848 (D.C. Cir. Jan. 23, 2003). In response, Congress quickly exempted "military readiness activity" from MBTA liability for incidental takings. *See* Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 315(d), 116 Stat. 2458, 2509-10 (2002) (requiring the Secretary of the Interior to exercise its authority under the MBTA to "prescribe regulations to exempt the Armed Forces for the incidental taking of migratory birds during military readiness activities"). The exemption did not extend to the "operation of industrial facilities," even though the government had previously prosecuted activities that indirectly affect birds. *Id*. § 315(f)(2)(B) (exempting from "military readiness activities," the "operation of industrial activities"). Accordingly, the government asserts, Congress implicitly expanded "take" beyond its common-law meaning.

This argument makes no sense. A single carve-out from the law cannot mean that the entire coverage of the MBTA was implicitly and hugely expanded. More to the point, this was an exceptionally narrow exemption, as it did not even protect all military activities. By proceeding in a carefully targeted way, Congress had no reason to address the full scope of the MBTA.[12] The statute's scope was at that time uncertain in the courts; both the Eighth and Ninth Circuits had limited "takes" to hunting and poaching activities, while the Second Circuit had not. *See Newton Cnty. Wildlife Ass'n*, 113 F.3d at 115; *Seattle Audubon Soc'y*, 952 F.2d at 303; *FMC Corp.*, 572 F.2d at 908. Whether Congress deliberately avoided more broadly changing the MBTA or simply chose to address a discrete problem, the most that can be said is that Congress did no more than the plain text of the amendment means.

---

[12] For what it's worth, the year after Congress enacted the ESA with its intentionally broader definition of "take," Congress amended the MBTA but failed to broaden the meaning of "take." *See* An Act to Amend the Migratory Bird Act of July 3, 1918, Pub. L. No. 93-300, 88 Stat. 190 (1974) (amending the MBTA to include the new environmental treaty concluded between the U.S. and Japan).

No. 14-40128

Enacted against an indisputable common law background, the MBTA's use of "take," as in "pursue, take or destroy" animals, is fortified by the absence of temporizing modifiers like "harm" or "harass." The government omits reference to regulations under the statute, which essentially parallel the MBTA's language and conspicuously fail to incorporate "harm" or "harass." *See* 50 C.F.R. § 10.12 ("Take" means to "pursue, hunt, shoot, wound, kill, trap, capture or collect.") In stark contrast are the ESA and the MMPA in text and accompanying regulations. Like the Ninth Circuit, we find these differences "distinct and purposeful." *Seattle Audubon Soc'y*, 952 F.2d at 302. Harm and harass are the terms Congress uses when it wishes to include negligent and unintentional acts within the definition of "take." Without these words, "take" assumes its common law definition.

B.

Courts that have read the MBTA broadly, mainly the Second and Tenth Circuits, disagree with our ultimate conclusion, but not our analysis of the MBTA's text. Instead, these courts hold that because the MBTA imposes strict liability, it must forbid acts that accidentally or indirectly kill birds. The Second Circuit adopted this view in *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir. 1978). There, the government prosecuted a pesticide manufacturer that had inadvertently polluted a wastewater pond with a poisonous compound that killed migratory birds. On appeal, FMC argued that to violate the MBTA, "there must be an intent to harm birds culminating in their death" and that "it took no affirmative act" to kill birds. *Id.* at 906. The Second Circuit disagreed.[13] It noted that "the term 'act' itself is ambiguous" because "a person

---

[13] The meaning of "take" was not before the court, as the jury was charged about a "killing" of birds. *See FMC Corp.*, 572 F.2d at 903. Nevertheless, the government argues that *FMC*'s analysis is relevant here because the Second Circuit saw little difference between "killing" and "taking" under the MBTA. *See supra* note 10.

failing to act when he has a duty to do so may be held to be criminally liable just as one who has acted improperly." *Id.* FMC had acted by manufacturing a dangerous chemical and failing to prevent that chemical from reaching the pond. *Id.* at 907. The court acknowledged that it must balance the objectives of the MBTA with "a reluctance to charge anyone with a crime which he does not know he is committing," and it was aware of potentially unlimited liability under the act for negligent "killing" of birds. *Id.* at 905. Such consequences, the court soothed, could be remedied by sound prosecutorial discretion. *Id.* Perhaps in further amelioration of the reach it was imputing to the MBTA, the court analogized FMC's situation to tort notions of strict liability for conducting ultra-hazardous activities. *Id.* at 907. Because manufacturing pesticides is such an activity, the court reasoned, FMC was liable regardless how indirect or accidental the poisonings. *Id.*

In *United States v. Apollo Energies*, the Tenth Circuit upheld the misdemeanor convictions of two Kansas oil rig operators for violating the MBTA after dead birds were found trapped in heater treaters, tall, cylindrical devices used at oil drilling sites. 611 F.3d at 681. On appeal, the defendants argued that violating the MBTA in this manner is not a strict liability crime and, alternatively, that the MBTA is unconstitutionally vague. *Id.* As in *FMC*, no issue was raised about the meaning of "take." In the course of rejecting both contentions, the court addressed whether the MBTA applies to "activities beyond purposeful hunting or possession of migratory birds." *Id.* at 686. The court observed that all the cases limiting the MBTA to hunting activities "involved logging or pesticide application that modified bird habitat in some way." *Id.* In contrast, the case before it involved "whether unprotected oil field equipment can take or kill migratory birds." The court found such a conclusion "obvious." *Id.*

No. 14-40128

We decline to adopt the broad, counter-textual reading of the MBTA by these circuits. No doubt because the defendants failed to make the argument (and in *FMC* the issue was "kill" not "take" under the MBTA), neither of these decisions explores the meaning of "take." More fundamentally, we disagree that because misdemeanor MBTA violations are strict liability crimes, a "take" includes acts (or omissions) that indirectly or accidentally kill migratory birds. These and like decisions confuse the *mens rea* and the *actus reus* requirements. Strict liability crimes dispense with the first requirement; the government need not prove the defendant had any criminal intent. But a defendant must still commit the act to be liable. Further, criminal law requires that the defendant commit the act voluntarily. WAYNE R. LAFAVE, CRIMINAL LAW § 5.2(e) (5th ed. 2010). "To some extent, then, all crimes of affirmative action require something in the way of a mental element—at least an intention to make the bodily movement that constitutes that act which the crime requires." *Id.* Here, that act is "to take" which, even without a *mens rea*, is not something that is done unknowingly or involuntarily. Accordingly, requiring defendants, as an element of an MBTA misdemeanor crime, to take an affirmative action to cause migratory bird deaths is consistent with the imposition of strict liability. *See, e.g.*, *United States v. Morgan*, 311 F.3d 611, 616 (5th Cir. 2002).

There is no doubt that a hunter who shoots a migratory bird without a permit in the mistaken belief that it is not a migratory bird may be strictly liable for a "taking" under the MBTA because he engaged in an intentional and deliberate act toward the bird. *Cf. Sweet Home*, 515 U.S. at 722, 115 S. Ct. at 2425 (Scalia, J., dissenting) (hunter's mistaken shooting of an elk is a "knowing" act that renders him strictly liable under the ESA); *United States v. Kapp*, 419 F.3d 666, 673 (7th Cir. 2005) (holding Kapp liable under the ESA

No. 14-40128

over objection that the exotic cats he killed were unprotected hybrids).[14]  A person whose car accidentally collided with the bird, however, has committed no act "taking" the bird for which he could be held strictly liable.  Nor do the owners of electrical lines "take" migratory birds who run into them.  These distinctions are inherent in the nature of the word "taking" and reveal the strict liability argument as a non-sequitur.

We decline to adopt those courts' interpretation of the MBTA that substitutes the statute's misdemeanor criminal liability standard for what the Act deems criminal.  We agree with the Eighth and Ninth Circuits, which, recognizing this distinction, have placed decisive weight on the meaning of "take."

## C.

After surveying many circuit and district court cases, the district court adopted the Tenth Circuit's position and held it "obvious" that "unprotected oil field equipment can take or kill migratory birds." *MBTA Opinion*, 893 F. Supp. 2d at 847 (quoting *Apollo Energies*, 611 F.3d at 686).  The district court also adopted the Tenth Circuit's proximate cause requirement for strict liability and found that the birds' deaths were directly, foreseeably caused by the lack of roofing on Tanks 116 and 117.  *Id.*  The court distinguished its result from other district court cases that dismissed similar MBTA indictments arising from oil field operations because CITGO left Tanks 116 and 117 uncovered in violation of the Clean Air Act and Texas law.[15]  *See id.* at 846 (citing *United*

---

[14] Poisoning a field to deter birds, and "taking" migratory birds in the process, would also violate the MBTA under our reading.  *See United States v. Van Fossan*, 899 F.2d 636, 637 (7th Cir. 1990) (upholding conviction for spreading corn and wheat laced with poison designed to disperse birds congregating on defendant's property).

[15] Texas law requires oil operators to "take protective measures necessary to prevent harm to birds."  16 TEX. ADMIN. CODE § 3.22(a).  In particular, operators must "screen, net, cover, or otherwise render harmless to birds" large open-top storage tanks.  *Id.* § 3.22(b)(1).

No. 14-40128

*States v. Chevron USA, Inc.*, No. 09-CR-0132, 2009 WL 3645170 (W.D. La. Oct. 30, 2009), *Brigham Oil & Gas*, 840 F. Supp. 2d at 1202, *United States v. ConocoPhillips Co.*, 2011 WL 4709887 (D.N.D. Aug. 10, 2011)).  Aside from our critique of the *Apollo Energies* conclusion, there are at least two flaws in the district court's attempt to reconcile its approach with other oil field cases.  Most importantly, the MBTA's text provides no basis, explicitly or implicitly, for criminalizing migratory bird deaths because they result from violations of other state or federal laws.  Second, as already discussed, CITGO did not violate the Clean Air Act, the only law which the government accused it of violating.  Moreover, although the district court accused CITGO of violating state law, the company was never charged or convicted of state law violations.  Thus, even under the district court's erroneous legal interpretation, the MBTA convictions must be overturned.

D.

We note a final factor that supports our interpretation of the MBTA.  The scope of liability under the government's preferred interpretation is hard to overstate.  The MBTA protects approximately 836 species of birds.  *Brigham Oil & Gas, L.P.*, 840 F. Supp. 2d at 1202.  According to the U.S. Fish and Wildlife Service, between 97 and 976 million birds are killed annually by running into windows.  U.S. FISH & WILDLIFE SERV., MIGRATORY BIRD MORTALITY, MANY HUMAN-CAUSED THREATS AFFLICT OUR BIRD POPULATIONS 2 (2002).  Communication towers kill an additional four to five million birds each year, though the government estimates the number may be closer to forty or fifty million.  *Id.*  Cars may kill approximately 60 million birds each year.  *Id.*  Even domesticated cats are serial violators of the MBTA.  In Wisconsin alone, the government estimates that domesticated cats killed 39 *million* birds.  *Id.*  The government refused to speculate on the number of birds that cats kill nationwide, though it would certainly be "much higher."  *Id.*

No. 14-40128

If the MBTA prohibits all acts or omissions that "directly" kill birds, where bird deaths are "foreseeable," then all owners of big windows, communication towers, wind turbines, solar energy farms, cars, cats, and even church steeples[16] may be found guilty of violating the MBTA. This scope of strict criminal liability would enable the government to prosecute at will and even capriciously (but for the minimal protection of prosecutorial discretion) for harsh penalties: up to a $15,000 fine or six months' imprisonment (or both) can be imposed for each count of bird "taking" or "killing." Equally consequential and even more far-reaching would be the societal impact if the government began exercising its muscle to prevent "takings" and "killings" by regulating every activity that proximately causes bird deaths. The absurd results that the government's interpretation would cause further bolsters our confidence that Congress intended to incorporate the common-law definition of 'take' in the MBTA.

**CONCLUSION**

Differing with the district court's conclusions, we hold that Subpart QQQ only regulates equipment conventionally, not merely functionally, known as oil-water separators, along with specifically described ancillary equipment. Equalization Tanks 116 and 117 at CITGO's Corpus Christi refinery are outside the regulatory definition and thus are not "oil-water separators" under Subpart QQQ. Further, the MBTA's ban on "takings" only prohibits intentional acts (not omissions) that directly (not indirectly or accidentally) kill migratory birds. Accordingly, we REVERSE the convictions and REMAND with instructions to enter a judgment of acquittal on Counts Four, Five, Eight, Nine and Ten.

---

[16] In the toddler book, "My Nest is Best," the bird family escapes from a church steeple where the eggs in its nest were imperiled by the ringing of the bell.

No. 14-40128

**REVERSED and REMANDED with INSTRUCTIONS.**